**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISON**

| | |
|---|---|
| Roy Joffrion, | Civil Action No. 4:18-cv-03548-MGL |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| United States of America, | |
| Defendant. | |

Plaintiff Roy Joffrion ("Joffrion") brings this negligence action against the United States of America ("the government") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680.  Joffrion is suing the government for personal injuries and other damages he sustained as a result of a motor vehicle collision with a United States Postal Service ("USPS") employee on September 12, 2015.  The Court held a bench trial December 6-10, 2021.[1]  After hearing the testimony, assessing the credibility of witnesses, and carefully reviewing the joint exhibits admitted at trial, as well as the parties' pre-trial briefs, post-trial submissions, and post-trial proposed findings of fact and conclusions of law, the Court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).  To the extent any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## INTRODUCTION

This case arises out of a tragic accident between a USPS employee and three motorcyclists, Joffrion, Harry Halstead ("Halstead") and Jerry Jackson ("Jackson"), on September 12, 2015, near

---

[1] This case was consolidated for trial with the case of *Harry Halstead v. United States of America*,  4:18-cv-03540-MGL, which arose out of the same accident on September 12, 2015.

Conway, South Carolina ("Conway").  As Joffrion and nine of his friends were traveling home to

North Carolina on U.S. Highway 701 in Horry County, South Carolina ("Horry County"), Carolyn

Cole ("Cole"), a rural mail carrier for the USPS, entered the northbound travel lane from a private

driveway in her Saturn Ion.  When she did, Halstead and Joffrion collided with her car and were

ejected from their motorcycles.  Jackson, who was riding behind them, did not collide with Cole's

car, but was also ejected from his motorcycle and died at the scene.

## **PROCEDURAL HISTORY**

Joffrion filed this lawsuit against the government on December 20, 2018. (ECF 1)

Throughout the pendency of this case, the only semi-dispositive motion filed was Joffrion's motion

for partial summary judgment on September 8, 2021. (ECF 64)  The basis for the motion was that

the government should be collaterally estopped from contesting liability for the accident based on

the Court's prior ruling in the case of *Kimberly L. Jackson, Administratrix of the Estate of Jerry

D. Jackson, Jr. v. United States of America*, C/A No. 4:16-3219-RBH, 2018 WL 1755503 (D.S.C.

Apr. 12, 2018)[2].   Joffrion's motion was rendered moot when the government stipulated liability

on November 16, 2021. (ECF 78)

On November 4, 2021, Joffrion filed a motion to exclude two of the government's expert

witnesses, Sharon Reavis ("Reavis") and Tricia Yount ("Yount"), on the basis of untimely

production of their expert reports. (ECF 73)  Pursuant to the Court's Sixth Amended Scheduling

Order, the government's expert disclosure deadline was January 8, 2021, and this deadline required

that experts' written reports be produced when the experts were identified.  Although the

government timely identified Reavis and Yount, it did not produce their reports until November

---

[2] *Jackson* arose out of the same accident and concerned the wrongful death of Jackson.  This
Court issued its Order in *Jackson* on April 12, 2018.

12, 2021. Hence, Joffrion filed a motion to preclude the government from using these witnesses at trial.

On November 24, 2021, following receipt of Yount's expert report, Joffrion identified Dr. Mark Stebnicki ("Dr. Stebnicki") as an expert witness in the field of vocational rehabilitation. (ECF 81) In response, the government filed a motion in limine on November 26, 2021, to strike Dr. Stebnicki on the basis of untimely identification. (ECF 83) The Court denied both parties' motions and allowed Yount and Dr. Stebnicki to testify.

## I.      EVIDENCE AT TRIAL / FINDINGS OF FACT

### A. <u>Background</u>

1.      Joffrion lives in Hope Mills, North Carolina. (Tr. 282:10-12) He and his wife Misty have been married for 14 years and have one child together, a 14-year-old son, Royce. (Tr. 282:15-283:13) Joffrion is currently 44-years-old and was 38 at the time of the collision. (Tr. 303:8-11)

2.      Joffrion has a twelfth-grade education. (Tr. 284:5-8) He joined the Army Reserves while in high school and eventually enlisted in the Army on a full-time basis from 1998 through 2005. (Tr. 284:5-285:17) In 2009, Joffrion joined the North Carolina Army National Guard ("NCANG"), which rendered him eligible to obtain a full-time job as a mechanic through the NCANG's technician program sponsored by the United States Department of Defense ("DoD"). (Tr. 285:20-286:21, 297:15-23, 389:11-24) As a member of the NCANG, Joffrion trains one weekend a month and two weeks a year. (Tr. 390:10-23) As a mechanic in the DoD technician program, which was Joffrion's 9-to-5 job, and his primary source of income, he typically worked on various types of wheeled military vehicles and generators, and his job duties ranged from changing oil to rotating tires, to rebuilding and replacing engines. (Tr. 298:1-7, 390:10-391:7)

Joffrion currently works as an instructor in the NCANG's regional training center for maintenance in Fayetteville, North Carolina. (Tr. 286:9-21, 297:24-25)

3.    Joffrion has been deployed to combat zones multiple times during his military career. He served in Operation Iraqi Freedom from 2003 to 2004, and in Afghanistan from 2005 to 2006, 2010 to 2011, and 2012 to 2013. (Tr. 287:19-288:20)  In August 2010, while deployed in Afghanistan, Joffrion suffered an IED blast when his vehicle struck a landmine. (Tr. 288:21-289:20)  His shoulder and back were injured in the blast, and he also experienced Post-Traumatic Stress Disorder ("PTSD") as a result. (Tr. 291:20-23)  Joffrion currently has a 90% disability rating through the United States Department of Veteran's Affairs ("VA") as a result of the 2010 IED blast. (Tr. 293:9-23)  Joffrion, who is currently an E-6 staff sergeant, has received multiple awards for his military service, including five Army achievement medals and two Army commendation medals, one of which was an Army Commendation ("ARCOM") Medal with Valor for his service in Iraq in 2003. (Tr. 294:16-296:3)

4.    Joffrion has been riding motorcycles since childhood, and he was an experienced rider prior to the accident. (Tr. 299:21-302:2)

### B.  The Accident

5.    The accident at issue occurred on September 12, 2015, near Conway. (Tr. 304:17-305:18) In the preceding days, Joffrion, along with 10 of his friends who had gathered together for their annual 9-11 memorial ride, had been in Charleston, South Carolina ("Charleston") relaxing and sightseeing for a few days. (Tr. 304:17-305:18)

6.    Joffrion and his friends departed Charleston on September 12, 2015, to return home to North Carolina. (Tr. 306:19-307:11)  Along the way, the group stopped in Georgetown, South Carolina ("Georgetown") for lunch. (Tr. 306:19-307:11)  Afterwards they picked up Highway 701

North in Georgetown and began traveling towards Conway. (Tr. 306:19-307:11) The riders were traveling in a staggered formation at approximately 55 m.p.h. prior to the collision. (Tr. 306:19-307:11) Eventually, Joffrion noticed Cole's car unexpectedly enter Highway 701 and collide with Halstead's motorcycle. (Tr. 306:19-307:11) Joffrion, who was riding behind Halstead, then collided with the passenger side rear door of Cole's spinning car, causing his motorcycle to come to a "dead stop." (Tr. 307:12-308:5) He was ejected from his motorcycle following impact and his testicles struck the gas tank in the process. (Tr. 307:17-308:5) His body struck the top of Cole's car and then travelled about 30 feet before landing in the road. (Tr. 307:17-305:5, 309:14-25) Joffrion, who put his body in a tuck-and-roll position while airborne, eventually landed on his back and then rolled out before coming to rest in the roadway. (Tr. 309:14-25)

7.      The front end of Joffrion's motorcycle bent back into the bike's main frame as result of the impact, and the seat where Joffrion was sitting broke in half near the saddle horn. (Tr. 307:17-308:5, 313:10-17) Joffrion's scrotum and inner right leg were smashed against the gas tank of the motorcycle as his body was being ejected after impact. (Tr. 307:17-308:14, 317:25-318:6)

8.      Joffrion was wearing a helmet, long pants, combat boots, and a shirt when the collision occurred. (Tr. 305:19-24) He was riding a 2013 Harley Davidson Street Glide motorcycle with approximately 20,000 miles on it. (Tr. 305:19-306:5)

9.      Joffrion's entire body hurt at the crash scene, but the most intense pain was in his scrotal and pelvic area, back, and wrist. (Tr. 308:22-309:11) The pain in his pelvic area was the most severe. (Tr. 309:8-11, 317:1-5)

10.     Joffrion saw his deceased friend, Jackson, at the scene. (Tr. 308:25-309:11; 315:20-316:15)

11.     At trial, Joffrion described in detail the significant damage the collision caused to his motorcycle and Cole's car as shown by various photographs taken at the accident scene. (Tr. 310:1-316; EX. 1)

### C.  <u>Medical Treatment & Witness Testimony</u>

12.     Joffrion was transported from the accident scene by helicopter to the emergency department at Grand Strand Regional Medical Center ("GSRMC") in Myrtle Beach, South Carolina ("Myrtle Beach"). (Tr. 316:18-22; EX. 12)  Upon arrival, the "road rash" to his back, hands, right knee, and elbow started hurting, though his primary pain continued to be in his scrotal and pelvic area, back, and wrist. (Tr. 317:16-318:12)  Joffrion was admitted to the hospital and remained there until September 17, 2015. (Tr. 318:16-17, 319:4-6)  He was in pain throughout his stay, especially when attempting to walk or sit up in bed. (Tr. 318:24-319:3)

13.     Dr. Andrea Romano is the trauma surgeon who treated Joffrion at GSRMC, and her testimony was presented by video deposition. (Romano Depo. 8:21-9:2; EX. 8)  She testified Joffrion was admitted to the emergency department as a trauma alert and initially complained of pain in his left hip and leg and right wrist. (Romano Depo. 12:12-13:8)  It was specifically noted that Joffrion had "[p]ain to left leg with log roll to left leg and compression to pelvis." (Romano Depo. 13:3-8)  He underwent multiple imaging studies, including x-rays to his pelvis, right wrist, and chest, and computerized tomography ("CT") scans of his head, chest, cervical spine, abdomen, and pelvis.  (Romano Depo. 13:9-15:11; EX. 8: GSRMC 00006-00008)  Joffrion was diagnosed with acute pain due to trauma, open book pelvis/widened pubic symphysis, multiple abrasions, extraperitoneal hematoma in his pelvis, and blood in his urine upon admission. (Tr. 17:10-24, 22:13-21; EX. 8: GSRMC 00111)

14.    Joffrion was catheterized, placed in a T-pod pelvic binder, and eventually underwent a CT cystogram to check for bladder damage while in the hospital. (Romano Depo. 23:3-16, 26:15-28:11)  Following an orthopedic consult, the decision was made to treat Joffrion's pelvic injury non-surgically, and Joffrion eventually began working with physical therapy to promote mobility and walking. (Romano Depo. 29:5-30:18)  He continued to complain of pain in his thoracic spine, and he eventually underwent a magnetic resonance imaging ("MRI") and CT scan to the area, which revealed chronic compression fractures at the T8 and T9 levels, along with moderate edema in the area. (Romano Depo. 33:7-19, 36:13-37:21)  Joffrion was also eventually diagnosed with a right wrist fracture in the hospital. (Romano Depo. 30:19-31:24; EX. 8: GSRMC 00036)

15.    Joffrion was discharged from GSRMC on September 18, 2015. (Romano Depo. 32:13-14) He was prescribed Flexeril and Percocet, directed to ambulate with a walker and bear weight as tolerated, and follow-up with orthopedics after returning home. (Tr. 35:11-36:2)

16.    At trial, Joffrion testified about several photographs of his injuries that were taken during his hospital stay and in the days following his discharge.  The graphic photographs showed the swelling of his thighs, discoloration and bruising to his scrotum, and inner right thigh in particular, and abrasions and road rash on his back, arms, and hands, and his splinted right wrist (Tr. 320:6-323:11; EX. 37: Joffrion Discovery Documents 0000338-00349)

17.    Joffrion returned home to North Carolina on September 18, 2015. He was driven by his wife. (Tr. 323:9-13)

18.    At trial, Joffrion acknowledged having certain pre-existing injuries that necessitated medical treatment over the years prior to the accident.  He had the meniscus in his right knee surgically repaired following a snowboarding accident in 2001. (Tr. 323:14-23)  In 2014, he began seeing Dr. Daniel McBrayer ("Dr. McBrayer"), an orthopedic surgeon, in Fayetteville, North

Carolina, due to increased swelling and pain in his right knee, especially when running during his National Guard fitness events. (Tr. 323:14-324:10)  Dr. McBrayer diagnosed him with significant degenerative disease in the knee in May 2014 and started him on periodic Supartz injections. (Tr. 323:14-324:10, 370:3-7; EX. 7: Fayetteville Ortho 00005-00006)  He received another round of injections in his knee in March 2015. (EX. 7: Fayetteville Ortho 00010-00012)  In 2014, Dr. McBrayer also helped Joffrion obtain a non-impact profile with the Army for his knee, which allowed him to avoid running during fitness events and perform a non-impact event, like using an elliptical machine or riding a bike, instead. (Tr. 324:14-23, 369:12-370:2)  Joffrion's right shoulder was also injured in the 2010 IED blast in Afghanistan. (Tr. 325:8-18)  Joffrion was not treating for any mental health or back issues prior to the motorcycle accident, and he did not have any restrictions that limited his ability to do his job. (Tr. 325:19-326:1, 299:17-20)

19.     At trial, Joffrion explained that some of his injuries healed uneventfully upon his return home to North Carolina, while others lingered, and a few worsened. (Tr. 323:14-365:10)

**Pelvic Injury**

20.     Joffrion initially sought follow-up care for his pelvic pain with Dr. McBrayer at Fayetteville Orthopaedics. (Tr. 327:16-328:6, 484:20-486:1)  His initial visit was on September 22, 2015, and he was walking with a cane at the time. (Tr. 484:20-486:1) Dr. McBrayer ordered additional x-rays, and the pelvic x-ray revealed a 14mm diastasis at Joffrion's pubic symphysis. (EX. 7: Fayetteville Ortho 00015)  Joffrion was instructed to continue limiting his mobility and follow-up in two weeks. (EX. 7: Fayetteville Ortho 00015)

21.     Joffrion saw Dr. McBrayer on several more occasions for his pelvic pain in 2015 and early 2016, and over the course of these visits reported some improvement, but never complete relief. (Tr. 486:2-9; EX. 7: Fayetteville Ortho 00019-00022, 00025-00027, 00030-00032, 00035-00037)

In December 2015, Dr. McBrayer recommended Joffrion begin physical therapy for his pelvic injury, and Joffrion did so. (EX. 7: Fayetteville Ortho 00032-00034, 00044-00049) During a May 2, 2016, follow-up visit with Dr. McBrayer, Joffrion reported some improvement in his pelvic area, but still reported soreness and tenderness at his pubic symphysis. (EX. 7: Fayetteville Ortho 00050-00051) He also rated his pain to be 4/10. (EX. 7: Fayetteville Ortho 00050) Dr. McBrayer recommended an additional course of physical therapy at this time, which Joffrion started but was unable to complete due to ongoing pelvic pain. (EX. 7: Fayetteville Ortho 00056, 00058-00063)

22.     On May 17, 2016, Dr. McBrayer ordered a pelvic MRI due to concerns of a sports hernia. (EX. 7: Fayetteville Ortho 00064-00066) The MRI was performed on May 19, 2016, and confirmed a sports hernia injury. (EX. 7: Fayetteville Ortho 00069) During his follow-up visit with Dr. McBrayer on May 25, 2016, Joffrion was noted to have "done well overall but continue[d] to experience pain within his groin with exertional activities." (EX. 7: Fayetteville Ortho 00073) Dr. McBrayer referred Joffrion to a pelvic specialist at Duke Health at this time. (EX. 7: Fayetteville Ortho 00069, 00071-00072, 00073)

23.     Joffrion was seen by Dr. Thomas Novick ("Dr. Novick") at Duke Health on July 14, 2016. (Tr. 335:6-8, 498:8-9) Dr. Novick is a board-certified general surgeon who has surgically repaired hundreds of sports hernia injuries over his 35-year career. (Tr. 490:23-491:4, 492:20-493:17, 494:13-22) Dr. Novick was the general surgeon for the Carolina Panthers for 15 years, and his patients have ranged from recreational to college to Olympic to professional athletes. (Tr. 495:3-496:4)

24.     During his initial visit with Dr. Novick, Joffrion reported pelvic pain that had been present since the motorcycle accident, and he described symptoms as more prevalent on his right side than his left. (Tr. 499:12-22, 500:10-13; EX. 6: Duke Health–Novick–00001-00007) Given that

9

Joffrion was still not far removed from the accident, Dr. Novick decided to treat the symptoms conservatively, which he did by giving Joffrion a steroid injection in the region of his pubic tubercle, pubic rami, and adductor attachment to the pubis. (Tr. 499:17-500:9, 564:20-565:1; EX. 6: Duke Health–Novick–00001-00007)  Joffrion responded well to the injection and experienced some immediate relief, so Dr. Novick decided to put him on anti-inflammatories, rest, heat and ice, and physical therapy, and see if conservative treatment would resolve his injury. (Tr. 502:1-5, 509:4-510:9; EX. 6: Duke Health–Novick–00001-00007)

25.     Joffrion followed up with Dr. Novick on September 8, 2016. (Tr. 512:4-6; EX. 6: Duke Health – Novick – 00008)  During this visit, Joffrion reported his pain as improved but not gone. (Tr. 512:13-20)  He also reported a continued popping sensation when flexing his hip and moving his leg up and down. (Tr. 512:21-513:1)  Dr. Novick examined Joffrion and found no sign of a traditional hernia, though he noted Joffrion to be tender at his pubic symphysis, and still tender around the area where he had received the injection during his previous visit. (Tr. 513:2-6)  The plan for Joffrion following this visit was to resume physical therapy and decrease his activity doing certain things. (Tr. 513:7-10)  Dr. Novick instructed Joffrion not to squat, do dead lifts, or sit-ups, or lift anything heavy. (Tr. 513:10-16)

26.     On June 14, 2017, Joffrion was initially seen by physical therapist Paige Blue at Pinehurst Surgical Clinic ("Pinehurst Surgical") in Pinehurst, North Carolina, because of ongoing pelvic and groin pain. (Tr. 333:4-15, 458:12-20; EX. 9: Pinehurst Surgical 00010-00012)  From June 2017 through August 2018, Joffrion had several visits to Pinehurst Surgical where he received continual treatment to his pelvis and groin, including physical therapy, massage therapy, pelvic realignment, and dry needling. (Tr. 338:19-339:20, 487:23-488:7; EX. 9: Pinehurst Surgical 00013-00046)

Joffrion's treatment at Pinehurst Surgical was beneficial in that it provided him temporary relief from his symptoms, but they always returned. (Tr. 328:19-329:10, 488:2-7)

27.     On February 14, 2019, Joffrion followed-up with Dr. McBrayer due to persistent pelvic pain. (Tr. 486:20-488:25)  Dr. McBrayer noted during this visit that Joffrion had experienced "some element of pelvic pain since his motorcycle accident in which he suffered a pelvic diastases."  It was further noted the pain increased with higher impact activities, like attempted jogging, and that Joffrion was unable to do significant sit-ups or crunches. (Tr. 488:8-21; EX. 7: Fayetteville Ortho 00162)   Additional pelvic x-rays were taken at this time and revealed "a continued diastasis of 1.5cm with no current fracture or acute injury." (EX. 7: Fayetteville Ortho 00163)  Dr. McBrayer recommended continued conservative management of the pelvic injury at this time, as he was concerned about the significant undertaking of any potential surgical repair. (EX. 7: Fayetteville Ortho 00164)

28.     Joffrion returned to Dr. Novick on May 2, 2019, due to continued discomfort and tenderness in his pelvic area, still primarily on the right side. (Tr. 513:17-514:17)  Given the length of time Joffrion's symptoms had persisted, Dr. Novick suspected surgery might be needed, so he ordered a new MRI. (Tr. 514:18-515:13)  Joffrion reported to Dr. Novick during this visit that he had recently torn his left bicep at work while moving a truck tire, and Dr. Novick encouraged him to get his bicep repaired before proceeding with a potential surgical repair of his pelvic injury due to the length of time Joffrion would need to be on crutches following a pelvic surgery. (Tr. 515:14-516:5)

29.     Joffrion injured the bicep muscle in his left arm while at work in April 2019.  He initially injured the muscle in early April while he and Courtney Scott, his work partner, were putting a tire on a spare tire mount on the rear of a jeep. (Tr. 478:24-480:15)  He injured the muscle further,

tearing it, later in the month when they were moving tires from a truck onto a forklift, and one of the tires started to fall over. (Tr. 479:16-480:7) Joffrion attempted to stop the tire from falling with his left arm and tore his bicep muscle in the process. (Tr. 480:8-481:13) Joffrion had done this type of work on many previous occasions without incident, and testified he would not have injured his bicep on this particular occasion had his mobility not been limited by the motorcycle crash. (Tr. 481:2-17) Joffrion did not experience pain in any part of his body other than his left bicep muscle when trying to stop the falling tire. (Tr. 348:22-349:11) Joffrion's work supervisor at the time was Bobby Emanuel ("Emanuel"), and he did not witness the event that caused the bicep injury. (Tr. 481:18-482:14)

30.    Dr. Novick testified he did not believe the incident that caused Joffrion's bicep injury played any causative role in the pelvic symptoms Joffrion was complaining of during his May 2, 2019, office visit. (Tr. 516:9-13) He based this opinion on the fact Joffrion did not complain of any new pain or problems in his pelvic or abdomen area that occurred acutely after the tire incident, and he further testified that it would be unusual for someone to hurt their bicep and abdomen at the same time, because bicep injuries typically occur when the muscle is isolated in some fashion and is placed under too much stress for the muscle to handle. (Tr. 516:14-517:10) Dr. Novick testified that he has previously torn both of his bicep muscles without any injury to his abdominal muscles. (Tr. 574:22-575:2) Furthermore, the pelvic symptoms Joffrion reported to him in May 2019 remained perfectly consistent with the symptoms previously reported in 2016. (Tr. 517:11-19)

31.    Joffrion underwent a new pelvic MRI on August 6, 2019. (Tr. 518:2-13) This study, according to Dr. Novick, showed changes in Joffrion's adductor muscles on both sides of his body, and also revealed continued changes in his pubis region, as well as defects in his rectus muscles

where they attached to the pubis bone. (Tr. 518:5-13)  Dr. Novick characterized these changes as "standard progression" of this type of injury, and testified these changes were noticeable when he compared the August 6, 2019, MRI with Joffrion's previous MRI from May 19, 2016. (Tr. 518:5-13)  Dr. Novick also confirmed the pain and limited range of motion in Joffrion's left hip and leg at GSRMC immediately following the accident would be further evidence Joffrion's core injury was caused by the motorcycle accident. (Tr. 518:18-519:14)

32.     Joffrion returned to Dr. Novick on August 29, 2019. (Tr. 519:15-23)   His symptoms remained similar to what they were during his previous visit, including being more symptomatic on the right side than the left, though Dr. Novick did point out to Joffrion some changes in his left adductor according to the most recent MRI. (Tr. 519:18-520:1)  Dr. Novick recommended surgery at this time. (Tr. 520:15-17)

33.     On October 7, 2019, Dr. Novick attempted to repair Joffrion's core injury laparoscopically, but during the procedure, he discovered Joffrion's bladder tethered to the bone in the area of Joffrion's pubic diastasis. (Tr. 522:19-523:1, 523:9-17)  Dr. Novick repaired this unanticipated condition intraoperatively, but he aborted the remainder of the procedure to allow the bladder to heal. (Tr. 523:1-17, 528:1-8)  Dr. Novick opined Joffrion's bladder became trapped in his pubic diastasis as the diastasis began to close after the crash. (Tr. 528:9-25; EX. 19: Functional Capacity 00002-00003)

34.     On December 2, 2019, Joffrion returned to Dr. Novick for the surgical repair of his core injury. (Tr. 531:17-19)   During this procedure, which was performed openly rather than laparoscopically, Dr. Novick cleaned up the prevalent scar tissue, repaired Joffrion's rectus muscles and pelvic floor, and reenforced his pelvic floor with mesh. (Tr. 532:2-533:11)  In an effort to address Joffrion's chronic pain, which was likely due to the amount of scar tissue that had

built up around his pelvic floor, Dr. Novick cut two nerves in Joffrion's groin area to cause numbness that would alleviate his pain. (Tr. 532:15-22) Dr. Novick characterized Joffrion's injury that he repaired during the surgery as "severe" and opined that the injury was caused by the motorcycle crash in September 2015. (Tr. 533:12-534:1)

35.     Following the December 2, 2019, surgery, Dr. Novick saw Joffrion for follow-up on multiple occasions through August 2020. (Tr. 534:22-544:10) Joffrion's post-operative recovery course consisted of limited weightbearing and other physical restrictions initially, physical therapy once his condition began to improve, and finally, the assignment of permanent physical restrictions to preserve the integrity and efficacy of the surgical outcome. (Tr. 534:22-544:10) The limitations assigned to Joffrion were intended to have him avoid activities that would put a great deal of stress on the surgically repaired area of his body, and they included no sit-ups, leg-lifts, squats, and deadlifts, as well as general lifting restrictions. (Tr. 543:5-544:3) Dr. Novick expected Joffrion to return to about 80-85 percent of his pre-injury level of function following the repair of his core injury, but he also expected Joffrion to always have a problem with the injury to some extent. (Tr. 542:12-25, 544:11-545:5) Joffrion testified he has experienced varying degrees of pain in his pubic symphysis region ever since the day of the crash, and he continues to do so. (Tr. 482:20-484:12)

36.     In September and October 2020, Dr. Novick issued separate letters detailing Joffrion's post-surgical physical limitations and confirming their permanency. (Tr. 545:18-547:18; EX. 6: Duke Health – Novick – 00281, 00279-00280) Specifically, Dr. Novick's letter of September 11, 2020, recommended Joffrion avoid full sit-ups, leg lifts, squats, or deadlifts moving forward to avoid recurrence of his symptoms, and his letter of October 22, 2020, confirmed that, while

Joffrion may experience some improvement in his symptoms, his physical limitations will likely be permanent and chronic in nature. (EX. 6: Duke Health – Novick – 00281, 00279-00280)

37.    In March 2021, Dr. Novick issued a functional capacity certificate on behalf of Joffrion documenting various functional activities and Army Combat Fitness Test ("ACFT") events Joffrion would be unable to perform due to his post-operative limitations. (Tr. 551:13-556:23; EX. 19: Functional Capacity Certificate 00001-00004)   He recommended that Joffrion, from a functional activity standpoint, not ride in a military vehicle wearing usual protective gear, and from an ACFT event standpoint, not participate in the maximum deadlift (a mandatory event), standing power throw, sprint-drag-carry (a mandatory event), leg tuck, or the two-mile run. (Tr. 551:13-556:23; EX. 19: Functional Capacity Certificate 00001-00004)   According to Dr. Novick, due to the extent of Joffrion's injury and the subsequent surgical repair, Joffrion was not expected to fully recover and would be at-risk for worsening his condition and causing additional injury if he participated in any of the indicated events or activities. (Tr. 554:22-555:19; EX. 19 Functional Capacity Certificate 00001)   Despite these assigned limitations, Dr. Novick explained Joffrion needed to remain physically active moving forward by engaging in non-impact activities like walking, swimming, riding a stationary bike, or using an elliptical machine, and maybe even some limited light jogging. (Tr. 549:12-550:2)   The goal was for Joffrion to avoid any activities that cause much twisting or rocking of his pelvis. (Tr. 550:2-551:4)

38.    Dr. Novick characterized the term "sports hernia" as a misnomer for the injury it describes, which is pain in the pelvic region suggestive of a hernia, but without the other classic symptoms of a hernia on physical examination. (Tr. 492:23-493:17)   He explained that a more appropriate characterization for this injury is a "core injury," which is what Joffrion sustained as a result of the motorcycle crash. (Tr. 498:10-499:22, 563:3-18)   According to Dr. Novick, the injuries to

Joffrion's pubic symphysis and groin were not separate and distinct injuries, but rather were "interwoven to the injury to the pelvis and injury to the muscles surrounding the pelvis." (Tr. 563:3-18)  He testified this type of injury can be caused by something other than sports, including a traumatic event such as a motorcycle crash. (Tr. 498:14-499:4, 511:24-512:3)

39.     At trial, Dr. Novick testified about Joffrion's injury as depicted in a photograph taken of his scrotum and inner thighs at the hospital in the days following the crash.  He testified the hematoma and ecchymosis shown on Joffrion's scrotum, and the inside of his right leg, was indicative of a very severe core injury. (Tr. 510:10-511:23; EX. 37: Joffrion Discovery Documents 00348)  Dr. Novick also testified the CT scans of Joffrion's abdomen and pelvis taken at GSRMC on the day of the crash—which he reviewed prior to testifying at trial—showed damage to Joffrion's rectus muscles, and that the changes to Joffrion's muscles, as seen on later MRI studies, were consistent with the natural course of progression of this type of core injury. (Tr. 556:24-558-11, 572:25-573:13, 574:17-575:2, 578:8-13)

40.     At trial, Dr. Novick opined the motorcycle accident on September 12, 2015, was the cause of Joffrion's core injury that he surgically repaired on December 2, 2019. (Tr. 498:1-4)

41.     At trial, Joffrion presented photographs of the surgical scarring from the two surgeries performed by Dr. Novick in 2019. (EX. 2: Joffrion Scars 00001-00005)

42.     Joffrion continues to have issues with his pelvic area, and he compared his current symptoms to being stabbed with a knife or ice pick in that part of his body. (Tr. 372:23-373:12) Beyond that, he can no longer squat or do dead lifts. (Tr. 330:18-331:14) He is limited in his ability to bend over. (Tr. 330:18-331:14)  Sitting for extended periods of time, especially when driving, aggravates his groin area. (Tr. 330:18-331:14) Lifting and navigating stairs is difficult.  Sexual intercourse is still painful as well. (Tr. 330:18-331:14)  To manage the pain, Joffrion limits his

movements as necessary and avoids lifting heavy objects. (Tr. 347: 23-348:7)  He tries to stay reasonably active by doing some walking and light jogging, and he also takes muscle relaxers as-needed. (Tr. 349:18-350:8)  His plan for dealing with his pelvic limitations moving forward is to avoid doing anything that might reinjure the area. (Tr. 373:13-16)

43.    Of the various injuries Joffrion sustained in the motorcycle crash, the pelvic injury still bothers him the most. (Tr. 372:23-373:1)

**Back Pain**

44.    Joffrion also injured his back in the motorcycle accident, and it remained painful and tender in the months following. (Tr. 350:9-21, 352:21-25)

45.    Joffrion saw Dr. Nael Shanti ("Dr. Shanti"), a spine surgeon with Cary Orthopaedic in Cary, North Carolina, for his back injury following the accident. (Tr. 350:9-351:14, 352:14-25; EX. 5).  He first presented to Dr. Shanti on October 13, 2015, due to persistent pain in his mid-back (EX. 5: Cary Ortho 00002)  The MRI of Joffrion's thoracic spine from GSRMC was reviewed at this time, and records indicate the study showed evidence of anterior compression fractures of T8 and T9, likely chronic, with soft tissue edema in the latissimus dorsi and subcutaneous soft tissue. (EX. 5: Cary Ortho 00004)  Records indicate Dr. Shanti remained concerned about a possible acute thoracic compression fracture injury at this time. (EX. 5: Cary Ortho 00004)  The plan following this visit was for Joffrion to modify his physical activity, take Flexeril to manage his pain, and undergo a follow-up MRI of his thoracic spine. (EX. 5: Cary Ortho 00004-00005)

46.    Joffrion underwent the new thoracic MRI on October 13, 2015. (EX. 5: Cary Ortho 00006)  This study showed the chronic compression fractures of T8 and T9, described as being approximately 25-35 percent severity, and interval resolution of the dorsal soft tissue edema shown on Joffrion's initial MRI from GSRMC. (EX. 5: Cary Ortho 00006)

47.    Joffrion received follow-up care from Dr. Shanti for his back injury on October 19, 2015, November 9, 2015, December 21, 2015, and February 22, 2016.  (EX. 5: Cary Ortho 00008, 00015, 00019, 00024, 00028)  On October 19, 2015, Dr. Shanti recommended that Joffrion not participate in any physical tests for the NCANG, including no pushups or sit-ups, until January 2016. (Tr. 353:1-9; EX. 5: Cary Ortho 00012)  It was noted on November 9, 2015, that Joffrion had been experiencing occasional "numbness and tingling" in his spine, so he was referred to physical therapy. (Tr. 351:2-16, 353:10-15; EX. 5: Cary Ortho 00018)

48.    Joffrion initially attended physical therapy at Pivot Physical Therapy in Hope Mills, North Carolina, from January 7, 2016, through February 25, 2016. (EX. 10: Pivot PT 00002-00041)  It was noted during Joffrion's first visit on January 7, 2016, that he reported injuring his right groin in the motorcycle accident, but pain felt present primarily in the left side. (EX. 10: Pivot PT 00002)

49.    Joffrion testified his back injury is much improved, though it still bothers him periodically. Prolonged standing and sitting upright causes occasional soreness. (Tr. 354:4-12)

50.    Joffrion testified his back was not a problem for him prior to the motorcycle accident, and did not limit or restrict his activities in any respect. (Tr. 354:13-21)

**Right Wrist**

51.    Joffrion was diagnosed with a right wrist fracture at GSRMC and had the injury splinted there prior to discharge. (Tr. 321:13-18; Romano Depo. 30:19-31:24; EX. 8: GSRMC 00036)

52.    Joffrion initially sought follow-up care for his wrist with Dr. McBrayer at Fayetteville Orthopaedics. (Tr. 327:16-328:6)  His initial visit was on September 22, 2015, at which time additional x-rays were taken. (EX. 7: Fayetteville Ortho 00015)  The x-rays showed no evidence of fracture or other abnormalities, but records indicate Dr. McBrayer suspected Joffrion had a "significant sprain" warranting immobilization. (EX. 7: Fayetteville Ortho 00015-00016)

Joffrion's right wrist was casted during this visit, he was prescribed Percocet, and directed to follow-up in two weeks. Joffrion was also directed to remain out of work and limit activity with his right arm. (EX. 7: Fayetteville Ortho 00016, 00017)

53.    Joffrion followed-up with Dr. McBrayer for his right wrist on October 6, 2015, November 3, 2015, December 22, 2015, February 2, 2016, and May 2, 2016. (Tr. 355:4-22; EX. 7: Fayetteville Ortho 00019, 00025, 00030, 00035, 00050)  Joffrion was prescribed physical therapy to promote range of motion and strengthening in December 2015, and he received the therapy in January and February 2016. (EX. 7: Fayetteville Ortho 00033-00034, 00038-00040, 00049)  Joffrion reported gradual improvement of his wrist pain during this timeframe.

54.    Joffrion returned to Dr. McBrayer on March 26, 2018, complaining of worsening symptoms in his right wrist, including swelling, numbness, and tingling. (EX. 7: Fayetteville Ortho 000129)  He was wearing his wrist brace at the time. (EX. 7: Fayetteville Ortho 000129)  Records indicate the increased wrist pain occurred while he was working over the weekend. (EX. 7: Fayetteville Ortho 000129)  Additional x-rays of Joffrion's right wrist were taken during this visit, and a MRI was also ordered. (EX. 7: Fayetteville Ortho 000130-00031)  The MRI was performed at Valley Imaging on March 28, 2018. (EX. 7: Fayetteville Ortho 000132)

55.    Joffrion followed-up with Dr. McBrayer on March 29, 2018, to review the MRI results. (EX. 7: Fayetteville Ortho 000132)  The MRI demonstrated a Triangular Fibrocartilage Complex ("TFCC") tear. (EX. 7: Fayetteville Ortho 000133)  Dr. McBrayer administered Joffrion a steroid injection, which provided immediate relief and confirmed the TFCC injury, and Dr. McBrayer recommended Joffrion seek follow-up care with his partner, Dr. Kimberly Barrie ("Dr. Barrie"), who specialized in this type of injury. (EX. 7: Fayetteville Ortho 000133-000134)

56.     Joffrion was seen by Dr. Barrie on April 18, 2018. (Tr. 355:23-356:20; EX. 7: Fayetteville Ortho 000135)  He reported his pain as "moderate," rating it 5/10, with continued swelling. (EX. 7: Fayetteville Ortho 000135)  He also reported his wrist pain was exacerbated by his mechanic work.  Dr. Barrie reviewed his previous MRI, confirmed a TFCC tear, and also noted "moderate 4th and 6th dorsal compartment extensor tenosynovitis." (EX. 7: Fayetteville Ortho 000135)  Dr. Barrie gave Joffrion a radiocarpal joint injection during this visit, and then applied a short arm cast. (EX. 7: Fayetteville Ortho 000137)  Joffrion was also given a Medrol Dose Pak for inflammation and pain and directed to follow-up in two weeks. (Tr. 356:4-11; EX. 7: Fayetteville Ortho 000137)

57.     Joffrion returned to Dr. Barrie on May 2, 2018, and reported continued swelling in his wrist, and intermittent numbness and tingling in his fingers. (EX. 7: Fayetteville Ortho 000138)  He also reported the pain being aggravated by lifting. (EX. 7: Fayetteville Ortho 000138)  Dr. Barrie discussed ergonomic techniques and modifications Joffrion could use to minimize strain on his wrist and hand, and instructed him to follow-up with her as needed. (EX. 7: Fayetteville Ortho 000140)

58.     At trial, Joffrion testified his right wrist improved over time, though the pain never resolved completely. (Tr. 489:1-7)  Busy days at work that required frequent use of the wrist would often exacerbate the pain. (Tr. 489:8-17)  His current wrist limitations are limited range of motion and irritation at work, especially when using air tools. (Tr. 357:13-20)  He has to take periodic breaks at work to rest his wrist. (Tr. 357:21-358)  He also takes Flexeril and Naproxen as-needed to manage his wrist pain. (Tr. 358:3-6)

**Right Knee**

59.    Joffrion injured his right knee in the accident, which he testified was due to the impact of his body with the roadway after being ejected from his motorcycle. (Tr. 324:6-13)  He described his knee as constantly painful and swollen afterwards, which he testified was different from the problems he was having with his knee beforehand. (Tr. 324:11-325:7, 370:8-22)  Joffrion contrasted the post-accident condition of his knee with its pre-accident condition by describing the consistency of symptoms.  Before the crash, his knee tended to swell only when he was participating in fitness events for the NCANG, but after the crash, the knee stayed swollen, painful, and had very limited mobility. (Tr. 370:8-22)  Following the accident, just walking around the block with his wife and dogs was challenging for him because his gait had changed and the knee pain was severe. (Tr. 370:11-22)

60.    After the accident, Joffrion first saw Dr. McBrayer for his right knee pain on May 2, 2016. (EX. 7: Fayetteville Ortho 00050-00054)  Records indicate Joffrion reported the knee had been bothering him quite a bit, and he requested another series of Supartz injections. (EX. 7: Fayetteville Ortho 00052)  Range of motion for the knee was noted to be limited, and Joffrion's gait was noted to be abnormal and favoring his right side. (EX. 7: Fayetteville Ortho 00052)  Another round of Supartz injections was ordered during this visit, and six weeks of physical therapy was also ordered. (EX. 7: Fayetteville Ortho 00052, 00055-00056, 00065)

61.    Joffrion began physical therapy on May 5, 2016, but was unable to complete the six-week session due to persistent pain in his pelvic area. (EX. 7: Fayetteville Ortho 00058, 00061, 00063)

62.    Joffrion saw Dr. McBrayer periodically for his right knee throughout 2016, 2017, 2018, 2019, 2020, and 2021, and Dr. McBrayer treated the knee through conservative measures consisting primarily of periodic Supartz injections. (Tr. 371:13-25; EX. 7: Fayetteville Ortho

00077, 00086, 00101, 00104, 00118, 00121, 00124, 00127, 00141, 00144, 00147, 00154, 00161, 00169, 00173, 00179, 00183, 00187, 00191)  Joffrion is still receiving the injections from Dr. McBrayer, and he intends to continue doing so in the future. (Tr. 372:1-22)

63.     Though Joffrion primarily saw Dr. McBrayer for his right knee pain, he testified it was Dr. Novick's surgery in December 2019 that gave him the most relief for his knee pain because the surgery changed the way he walked and improved his gait. (Tr. 370:23-371:25)

**Abrasions/Road Rash**

64.     Joffrion's abrasions and road rash injuries healed within a couple of weeks of returning home. (Tr. 327:11-15)

**Mental Health Issues/PTSD**

65.     At trial, Joffrion described the decline in mental health he experienced following the collision.  He developed a "very short fuse" with his wife and son, and he started becoming very agitated in large crowds. (Tr. 359:2-12)  He explained how he started becoming filled with anger and rage, and had nightmares of the collision. (Tr. 360:2-9)  He eventually sought help at the insistence of his wife. (Tr. 360:8-9)

66.     Joffrion initially sought help through Cape Fear Valley Health. (Tr. 359:7-16; EX. 3)  He was seen by Terrence Sproul, a licensed clinical social worker, on April 28, 2016, and May 19, 2016, and was diagnosed with PTSD. (EX. 3: Cape Fear Valley Health 00002-00009, 00012)  Due to a lack of connection with this counselor, Joffrion eventually sought care with Plenty & Grace in Fayetteville, North Carolina. (Tr. 359:13-23)

67.     Joffrion was initially seen by Tracy Frink ("Frink") and James Rose ("Rose") of Plenty & Grace on June 2, 2016. (Tr. 361:17-22; EX. 11: Plenty & Grace 00001)  Plenty & Grace is a counseling center that offers therapy to military members and civilians alike, though

approximately 80% of their clientele is military. (Frink Depo. 7:2-10, 22:2-12)  Frink and Rose, who are husband and wife, are both licensed marriage and family therapists. (Frink Depo. 8:6-8)  Both are also ordained ministers and have been involved in counseling for more than 30 years. (Frink Depo. 9:9-10:17)  Frink has additional training as a trauma clinician, sex therapist, and in eye movement desensitization and reprocessing ("EMDR"). (Frink Depo. 13:10-16:12)  Rose and Frink occasionally co-facilitate therapy sessions with clients, which they did with Joffrion and his family. (Frink Depo. 7:11-13, 70:3-18)   Frink's testimony was presented by video deposition.

68.     Frink testified Joffrion came to Plenty & Grace because of problems with anger management and the extent to which it was affecting his marriage and his relationship with his son. (Frink Depo. 25:18-24)  She explained how Joffrion was initially hesitant to talk openly about the motorcycle accident, but once he became more comfortable doing so, his focus was on the accident and the difficulties it was causing him light of the injuries he suffered, as well as the death of his friend Jackson. (Frink Depo. 30:3-22)  Frink talked with Joffrion about his past military experience as well, including his deployments, but she testified the motorcycle accident quickly became the primary focus, and the event that was commanding the majority of their attention. (Frink Depo. 38:16-39:5)  Frink diagnosed Joffrion with PTSD during their initial meeting. (Frink Depo. 34:4-17)

69.     Frink worked with Joffrion through the use of various treatment techniques and modalities during their therapy sessions, including EMDR, cognitive reframing, mindfulness training using the S.T.O.P method, and eventually equine-assisted therapy, to teach Joffrion emotion regulation. (Frink Depo. 27:18-29:23, 39:19-41:14)

70.     Frink counseled Joffrion on ways to manage the difficulties he was having with intercourse as a result of his accident-related injuries, and she eventually recommended he see a pelvic floor

specialist for the persistent pain he was experiencing in his pelvic area. (Frink Depo. 63:3-21, 65:13-67:12)  Frink opined Joffrion's sexual problems were directly related to his pelvic injury from the motorcycle accident. (Frink Depo. 69:7-12, 72:1-6)

71.    Frink explained that Joffrion's wife and son were eventually integrated into several therapy sessions beginning in 2017 as a means of evaluating the progress Joffrion had made since he began treatment, and to get additional insight on areas where further improvement might be needed in the future. (Frink Depo. 77:22-79:11)  Frink also testified she involved Joffrion's wife and son in therapy sessions—particularly equine-based sessions—to help address the injuries he received from the motorcycle accident. (Frink Depo. 79:12-81:7, 81:19-84:21)

72.    Frink has also worked with Joffrion to help him come to terms with the permanent limitations he now has because of the accident, specifically his chronic pain management and imminent job loss. (Frink Depo. 99:9-103:1)  Frink is currently seeing Joffrion on an every-other-week basis and will likely need to do so for the foreseeable future. (Frink Depo. 109:10-18)  Frink testified their sessions may be able to be reduced to a monthly basis as things start to improve for Joffrion and his family. (Frink Depo. 109:19-110:12)  However, given Joffrion's chronic pain and the limitations he now deals with, Frink anticipates Joffrion will likely need therapy for the rest of his life to help him fend off, and manage, depressive tendencies. (Frink Depo. 111:12-25)

73.    Joffrion testified his therapy sessions with Plenty & Grace have been helpful for him, as well as for his family. (Tr. 361:23-362:25)  Joffrion has been going to therapy every two weeks since he began in June 2016, and he plans to continue going in the future. (Tr. 361:23-362:25; EX. 11: Plenty & Grace 00001-00186)

74.    Joffrion currently takes Zoloft and Trazadone for his PTSD to help manage his anger and anxiety. (Tr. 363:4-10)  He started taking both medications in 2016 or 2017, and had never taken either, or any similar medications, prior to the motorcycle accident. (Tr. 363:11-365:10)

75.    Joffrion testified he currently takes Zoloft, Trazadone, Flexeril, Naproxen, Viagra, and testosterone as a result of the motorcycle crash. (Tr. 373:17-375:1)  He takes the Zoloft on a daily basis to treat his PTSD and mental health issues, Trazadone nightly for sleep, Flexeril and Naproxen as-needed for pelvic, knee, and back pain, testosterone every two weeks for low testosterone levels, and Viagra as-needed for erectile disfunction. (Tr. 375:5-378:5)

76.    At trial, Joffrion testified he has incurred $251,665.58 in past medical expenses and $3,983 in related mileage as a result of the motorcycle collision. (378:6-383:23; EX. 32)

77.    Joffrion described himself as physically fit and a dedicated weightlifter until the motorcycle accident. (Tr. 385:8-9)  He lifted weights four to five days a week for a couple of hours a day. (Tr. 384:5-13)  He routinely worked out during his lunch break, and again at home when the workday ended. (Tr. 384:12-21)  Prior to the accident, Joffrion was able to bench press four to five reps of 465 pounds on a flat bench, and four sets of ten of 315 pounds on an incline bench. (Tr. 384:23-385:4)  After the collision, he was no longer able to lift at all. (Tr. 385:22-386:17)  In January 2021, he started going to the gym some with his son, but he only engages in a limited and modest workout consistent with the restrictions imposed on him by Dr. Novick. (Tr. 385:22-386:17)

78.    The accident-related injuries that still bother Joffrion, and those for which he anticipates needing future treatment, are his pelvic injury, his right knee, and his PTSD. (Tr. 412:1-11)  He plans to continue seeing Frink at Plenty & Grace for his PTSD and mental health issues, Dr. Novick

as-needed for any flare ups with pelvic pain, and Dr. McBrayer for any problems with his right knee. (Tr. 412:12-413:8)

79.     At trial, Joffrion described how the accident-related injuries have impacted his life.  He is no longer able to ride his motorcycle, nor is he able to travel in a vehicle for any appreciable distance without pain. (Tr. 414:17-415:5)  The daily activity of going to the bathroom is now painful. (Tr. 416:3-13)  The accident also caused problems in his marriage, particularly physical intimacy with his wife. (Tr. 388:16-389:10)  Due to the nature of his injuries, intercourse was too painful for many months after the accident, and while that has improved somewhat with the assistance of Joffrion's testosterone injections, Viagra, and therapy sessions at Plenty & Grace, things are still not what they were before the accident. (Tr. 388:16-389:10, 415:6-24)   His relationship with his son Royce was also adversely affected because Joffrion was unable to be as active with him due to his injuries.  Joffrion described how he was limited in his ability to throw a baseball and participate in karate with Royce. (Tr. 416:14-417:17)  He described his inability to go outside and have fun with his son as "depressing." (Tr. 417:16-17)

80.     Joffrion routinely performed a variety of household services prior to the crash, ranging from cutting grass to weeding to trimming hedges and doing other yardwork. (Tr. 386:18-387:23) He would also perform maintenance on the family vehicles, such as tire rotations and oil changes. (Tr. 387:3-23)  He is no longer able to do any of these things because of his pelvic injury. (Tr. 387:3-23)  Inside the house, Joffrion would help with the laundry, vacuuming, cleaning, and cooking, but now he is more limited in his ability to assist with these tasks. (Tr. 387:24-388:15) Joffrion is seeking $221,961 in damages for lost household services. (Tr. 419:4-6)

81.     Joffrion is currently employed by the NCANG and the DoD, and he has held both positions for approximately 12 years. (Tr. 389:11-390:5)  He performs his NCANG duties once a month and

26

two weeks a year. (Tr. 390:20-23)  His "technician" job as a mechanic is his daily 9-to-5 job. (Tr. 390:14-25)  This position is provided through the NCANG by the DoD, and to be eligible for the DoD technician position, Joffrion must be in the NCANG. (Tr. 389:22-24, 390:6-391:7)  He becomes ineligible for his DoD mechanic job if he is not in the NCANG. (Tr. 391:4-14)

82.     On February 16, 2022, Joffrion was notified by the NCANG that he would be involuntarily separated from the NCANG effective on April 15, 2022. (ECF 116, EX. 45)  He is being separated because of the pelvic injury he sustained in the motorcycle crash. (Tr. 391:15-392:5)  Because of the injury to his pelvic area and the subsequent restrictions and limitations placed on him by Dr. Novick, Joffrion is now unable to perform various physical activities required by the Army's new ACFT, including sit-ups, deadlifts, sprint-drag-carry, and the over-the-head medicine ball throw. (Tr. 391:19-392:5, 400:11-410:23; EX. 19: Functional Capacity 00001-00004)  Joffrion testified that neither his position with the NCANG nor the DoD would be in jeopardy had he not been involved in the motorcycle accident. (Tr. 392:6-19)

83.     Joffrion was out of work continuously from September 14, 2015, to November 12, 2015, following the accident due to his injuries and various medical appointments, and once he returned, he periodically missed additional time due to ongoing medical and accident-related appointments with Fayetteville Orthopaedics, Cary Orthopaedic, Pivot Physical Therapy, Cape Fear Valley Behavioral Health, Plenty & Grace, Pinehurst Surgical, Duke Health and his attorneys. (Tr. 392:20-393:10; EX. 37: Joffrion Discovery Documents 00313-00329; EX. 36: Joffrion Admin Documents_00760-_00806)  He testified he probably returned to work earlier than he should have, but did so because he had bills to pay and needed the income. (Tr. 393:4-10)  Joffrion testified he is seeking $22,862 in pre-trial lost technician wages. (Tr. 393:11-24)

84.    Joffrion testified the Army's Physical Evaluation Board ("PEB") has officially determined him to be unfit for duty, which means he will be losing both his position in the NCANG, and his DoD technician job as a mechanic. (Tr. 393:25-397:17; EX. 26: Physical Evaluation Board 00003) Prior to the accident, Joffrion intended to work his DoD technician job until age 62. (Tr. 397:22-24)

85.    Due to his imminent job losses, Joffrion is seeking damages in the amount of $816,703 for the future DoD technician wages he will lose; $29,167 for the future 401k employer match he will lose from the DoD; $107,848 for the future NCANG wages he will lose; and $190,273 in lost NCANG retirement pay. (Tr. 397:18-400:10; ECF 116, EX. 34)

86.    Misty testified on behalf of her husband at trial. (Tr. 637:18-19)  Misty works as a radiology instructor for the Army and has done so for 20 years. (Tr. 638:15-20)

87.    Misty learned of the motorcycle crash through a call from Patrick Burgess ("Burgess"), who was on the trip with Joffrion. (Tr. 639:13-19)  She then traveled to the hospital in Myrtle Beach with Burgess' wife to be with her husband. (Tr. 640:4-9)  She described Joffrion as drugged up, complaining of a lot of pain, and barely able to move when she first saw him in the hospital. (Tr. 640:10-18)  She testified that pelvic pain was Joffrion's primary complaint throughout his hospital stay, and that any time he tried to move, he was in excruciating pain, almost to the point of crying, which was out of character for her husband. (Tr. 640:25-641:12)

88.    Misty went to view and photograph Joffrion's motorcycle a couple of days after the crash, and when looking at the seat in particular, she discovered it was broken near the front saddle horn. She believes this area is most likely where Joffrion's genitals and groin area impacted the seat when the collision occurred. (Tr. 643:2-12)

89.     Misty described how she assisted with her husband's care upon return home to North Carolina.  She testified Joffrion was almost incapable of walking when he was discharged from GSRMC. (Tr. 643:18-22)  He was dependent upon a cane, very off balance, and could only take a step every few seconds. (Tr. 643:20-22)  She had to dress, bathe, and assist him with toileting once he was home because bending down was so difficult. (Tr. 644:10-20)

90.     Misty testified the injuries to Joffrion's pelvis and scrotum bothered him the most, though he also had problems with his right wrist and back. (Tr. 644:21-645:18)  She testified her husband never stopped complaining of pain and tenderness in his pelvis after the crash. (Tr. 646:15-647:5)  She explained how the pelvic pain caused him to change how he walked, which she believes led to additional pain in his back, knee, and ankle on his right side. (Tr. 647:6-11)  Prior to the accident, when she and Joffrion would walk their dogs, the two of them would walk side-by-side and maintain a unified pace, but after the accident, Joffrion was unable to keep up, and his right foot turned out to the side significantly when walking. (Tr. 647:11-18)

91.     Misty testified her husband was always trying to heal and get better after the crash. (Tr. 647:23-648:3)  She explained how he went through physical therapy in an effort to improve, which helped temporarily, but never resolved his pain. (Tr. 647:19-648:3, 657:1-25)  Misty testified she donated 60 hours of her own leave time to her husband so he could continue recuperating prior to returning to work, though he was anxious to return to work so he could help with their bills. (Tr. 646:1-4)

92.     Misty does not believe the work incident that caused Joffrion's left bicep tear in April 2019 had any effect on his core injury.  She testified her husband never had a problem with his pelvis or abdomen prior to the crash, and he never complained of any new or different pain in these areas

after he tore his bicep. (Tr. 648:8-649:4, 656:15-25)  Misty believes her husband would not have injured his bicep at work had he not been involved in the motorcycle accident. (Tr. 656:20-25)

93.     Misty testified the only physical limitation Joffrion had prior to the motorcycle crash was his right knee, which would become swollen and sore after extensive running. (Tr. 649:5-13) Otherwise, he had no physical limitations. (Tr. 649:5-13)  With respect to his mental condition, she testified Joffrion was a "jovial, happy person" before the motorcycle crash. (Tr. 649:14-17) Afterwards, he became irritable and extremely short-tempered, especially when interacting with their son, Royce. (Tr. 650:5-22)  She described how her husband became more reserved than normal and did not want to be around other people following the crash. (Tr. 650:5-22)  She also noticed he was uncomfortable and anxious when in a car, whether driving or riding as a passenger. (Tr. 650:5-22)  Misty eventually told her husband he needed to get professional help, which is when he started treating with Plenty & Grace. (Tr. 650:19-651:4)

94.     Misty testified Joffrion's counseling at Plenty & Grace has been beneficial for him, as well as the entire family. (Tr. 651:5-653:23, 668:9-669:14)   The therapy sessions helped Joffrion communicate more effectively about the effects of the motorcycle crash, and they also helped provide Misty and Royce perspective, in a controlled setting, as to why Joffrion was continually struggling with flashbacks and other mental problems stemming from the crash. (Tr. 652:9-653:3) Misty acknowledged that she and her husband dealt with problems like all married couples prior to the crash, but they worked through those without much difficulty. (Tr. 653:10-18)  She testified that had Joffrion not been in the crash, there would have been no need for any of them to seek help with Plenty & Grace. (Tr. 653:19-23)

95.     Misty testified Joffrion's ability to help out around the house was significantly impacted by the crash. He was unable to cut the grass, either with a push mower or riding mower, because

of the pelvic pain it caused, and holding a weed eater was too difficult in the months following the crash because the vibrations exacerbated his wrist pain. (Tr. 653:24-654:19)  He was also no longer able to clean off the roof or climb a ladder because his core injury left him too unstable and immobile. (Tr. 654:20-655:7)

96.    Misty testified the motorcycle crash adversely impacted their marriage.  They are no longer able to ride motorcycles or mountain bikes together, which they previously did on a regular basis. (Tr. 660:4-16)  They no longer went to Royce's karate tournaments as a family for many months because sitting on the bleachers, or standing for an extended period of time, was too painful for Joffrion. (Tr. 660:20-24)  She explained how their sex life was non-existent for at least a year afterward, and this only began to improve, to any significant degree, after Joffrion's surgeries in 2019. (Tr. 658:3-659:13)  Financially, their credit card bills began to pile up while Joffrion was out of work and receiving medical treatment, which led to friction between them, though the counseling sessions with Plenty & Grace helped gradually improve this problem through better communication. (Tr. 658:1-659:2)

97.    Misty described her husband as "almost like an absent father" to Royce following the accident due to his limited mobility and constant pain. (Tr. 660:25-661:14)   Activities like throwing a baseball in the backyard became non-existent. (Tr. 661:4-7)

98.    Misty believes her husband will continue to suffer from chronic pain as a result of the motorcycle crash. (Tr. 661:15-18)

99.    Burgess' testimony was presented by video deposition.  Burgess is from Four Oaks, North Carolina, and is an E-8 Master Sergeant with the NCANG. (Burgess Depo. 10:1-5, 10:10-12:12) He is Joffrion's supervisor in the NCANG and has known him since 2009 when they were deployed together in Afghanistan. (Burgess Depo. 9:9-17, 54:5-9)  The two became good friends

upon their return home. (Burgess Depo. 9:9-17)  Burgess was among the group of riders traveling home to North Carolina at the time of the accident. (Burgess Depo. 15:14-23)

100.    Burgess testified about the severity of the collision between Joffrion's motorcycle and Cole's car.  He explained that he and the other nine riders were travelling on Highway 701 North at approximately 55 m.p.h. when Cole's vehicle unexpectedly entered the roadway in the middle of the group. (Burgess Depo. 20:18-21:6)  He described the collision as an "explosion" and likened it to the world coming to an end at that point in time. (Burgess Depo. 20:18-21:6)  Burgess was traveling behind both Halstead and Joffrion, and he described how Halstead struck Cole's car and caused it to start spinning. (Burgess Depo. 25:6-23)  Then, Joffrion's motorcycle struck the car's back right quarter panel, causing him to be ejected from his bike. (Burgess Depo. 26:6-23, 27:2-3)  He described Joffrion as shooting up into the air then hitting the ground and rolling for what seemed like forever. (Burgess Depo. 26:13-23, 29:22-25)  After Burgess brought his motorcycle to a stop, he saw Joffrion jump up to go check on Jackson, who died at the scene, and then fall to the ground in pain. (Burgess Depo. 26:13-27:2, 29:22-30:6)  When he approached Joffrion, Joffrion said to him "Oh, my God…I feel like everything between my legs has been ripped out…It feels like my balls have been ripped out." (Burgess Depo. 29:6-21)  He also heard Joffrion complain of pain in his wrist at the scene. (Burgess Depo. 31:3-13)

101.    Burgess saw Joffrion in the hospital on the day of the crash, and Joffrion continued complaining of pain in his groin. (Burgess Depo. 40:2-17)

102.    Burgess described the changes he observed in Joffrion following the accident.  Beforehand, both when deployed in Afghanistan, and after their return home, Joffrion was "squared away" and did not let anything bother him; he was "happy go lucky" and tended to "go with the grain." (Burgess Depo. 49:10-50:16)  Even after Joffrion was impacted by the IED in 2010, Burgess said

32

Joffrion was just fine and carried on with his mission with no problems or limitations. (Burgess Depo. 52:6-53:18)   Once back home following their deployment, Joffrion was able to do everything he was supposed to, including pass his physical fitness test, to the point where he was promoted to his current E-6 rank. (Burgess Depo. 53:3-18, 72:24-73:7, 74:19-75:8)   Burgess described how Joffrion also lifted weights on a regular basis, and the two of them would often ride motorcycles and ATVs at Burgess' farm. (Burgess Depo. 49:13-22, 53:15-18)   After the motorcycle crash, Burgess said Joffrion was very limited physically, no longer able to run, lift weights, or to ride his motorcycle, and he also became bitter and depressed. (Burgess Depo. 54:12-55:15, 58:1-15)   Joffrion complained about his groin/pelvis, lower back, and knee the most. (Burgess Depo. 55:16-22, 77:14-78:5)   He described how Joffrion's physical limitations would cause him frustration, especially because they limited what he could do with his son. (Burgess Depo. 54:6-15, 58:22-59:5)   Burgess testified he encouraged Joffrion to consider medication to help manage his mental health struggles, and he was aware Joffrion began seeking counseling. (Burgess Depo. 54:21-55:5, 71:15-72:5)

103.    Burgess also testified about the impact of the motorcycle accident on Joffrion's military and work career.   He explained how Joffrion is limited in the type of heavy equipment he can move, and the torquing he can do, with wrenches in his DoD mechanic job, and he also explained how Joffrion is now unable to meet his military obligations, specifically the physical fitness requirements, due to his injuries, which will cause him to lose his DoD mechanic job. (Burgess Depo. 55:23-56:16)   Burgess, as  the supervisor of Joffrion's NCANG unit, received Joffrion's medical board packet and completed the information pertaining to Joffrion's physical limitations. (Burgess Depo. 55:20-57:10)   Based on his personal experience with, and observations of, Joffrion over the years, he believes Joffrion is no longer physically able to fulfill his NCANG duties.

(Burgess Depo. 57:6-16)   According to Burgess, Joffrion will lose his DoD technician job as a mechanic when he is processed out of the NCANG. (Burgess Depo. 56:1-19, 63:1-9)  Prior to the motorcycle crash, Joffrion was on course to earn the rank of sergeant major in the NCANG. (Burgess Depo. 74:9-18)

104.    Emanuel is a member of the NCANG, and he also works as a technician through the DoD. (Emanuel Depo. 9:3-5, 12:7-11, 12:25-13:8, 49:20-50:9)   He is the supervisor for the field maintenance shop in Red Springs, North Carolina, and was Joffrion's supervisor there from approximately 2009 through late 2019.  (Emanuel Depo. 7:14-19, 16:7-17:2, 17:13-21, 19:20-25) Emanuel's testimony was presented by video deposition.

105.    Emanuel testified about Joffrion's capabilities at work both before and after the motorcycle crash.  He characterized Joffrion as a "great employee" with great energy and enthusiasm about him prior to the crash. (Emanuel Depo. 21:4-14, 22:9)  He described Joffrion as smart, patient, invested in the job, and gifted at troubleshooting maintenance issues. (Emanuel Depo. 21:4-22:14) He testified Joffrion was a hard worker with no physical limitations. (Emanuel Depo. 22:19-24:5, 26:14-27:6)   Emanuel also confirmed Joffrion was physically fit and worked out routinely. (Emanuel Depo. 23:19-24:13)

106.    Emanuel testified Joffrion was out of work for several weeks following the motorcycle crash, and when he returned, he was limited to office duty due to the restrictions given to him by Dr. McBrayer. (Emanuel Depo. 30:16-23, 31:11-25, 56:1-12, 76:13-22) Emanual recalled Joffrion talking about the injury to his pelvic and abdominal area following his return, and Emanuel also noticed a change in Joffrion's gait after the accident. (Emanuel Depo. 38:10-21)  Joffrion walked with a hitch due to his pelvic pain. (Emanuel Depo. 33:4-24)   Joffrion's attitude also changed following the crash. (Emanuel Depo. 34:15-35:12)  He became "a loner" and developed an attitude

with his co-workers, to the point where they began avoiding him. (Emanuel Depo. 34:22-35:12) He became short-tempered and less patient, which was out of character. (Emanuel Depo. 35:13-25, 37:17-38:3)  Emanuel testified he and Joffrion were no longer on good terms when Joffrion left his shop in 2019 due to Joffrion's changed attitude. (Emanuel Depo. 44:25-15, 46:2-47:3)

107.    Emanuel was aware Joffrion injured his bicep muscle while on the job in April 2019, but he did not witness the event that caused the injury. (Emanuel Depo. 38:22-39:9)  He heard about the incident from Joffrion, and he does not know exactly what occurred. (Emanuel Depo. 39:10-21, 71:2-12, 72:6-15)

108.    Emanuel also confirmed employment in the NCANG is a prerequisite to employment through the DoD technician program. (Emanuel Depo. 13:17-14:12)

109.    Ron Gosciniak ("Gosciniak") is the retired platoon sergeant for Joffrion's NCANG unit. (Gosciniak Depo. 7:8-13)  Gosciniak served in the special forces out of Fort Bragg from 1988 through 1994, and he joined the NCANG in 2002 following the events of September 11, 2001. (Gosciniak Depo. 7:17-21)  His testimony was presented by video deposition.

110.    Gosciniak met Joffrion in September 2014 when Gosciniak was transferred to the Armory in Red Springs, North Carolina. (Gosciniak Depo. 8:9-22)  At the time, Joffrion was working his DoD technician job as a mechanic in the field maintenance shop behind the Armory, and Gosciniak, immediately impressed with Joffrion's work ethic and job performance, had Joffrion transferred to his NCANG platoon as an "88 mic" transportation employee. (Gosciniak Depo. 8:23-9:18)

111.    Gosciniak became Joffrion's NCANG platoon sergeant in January 2015, and Joffrion became his "go-to guy" because of the leadership he brought to Gosciniak's new platoon. (Gosciniak Depo. 9:7-18, 11:12-14, 16:17-22)  Gosciniak described Joffrion as one of the best

sergeants and mechanics he ever met in the military, and he testified Joffrion exceeded his job performance expectations in every way. (Gosciniak Depo. 10:13-11:11, 12:3-19, 17:3-8, 41:25-42:9) Joffrion was "smart…caring…and took pride in everything he did. (Gosciniak Depo. 14:13-16)  Gosciniak testified Joffrion lifted weights on a daily basis and had no physical limitations while serving as a member of his platoon prior to the motorcycle crash. (Gosciniak Depo. 13:8-14:3, 17:9-16, 43:7-19, 45:2-10)

112.    Gosciniak characterized the changes he observed in Joffrion after the crash as "huge." (Gosciniak Depo. 18:4-8)  Joffrion's primary physical complaint after the crash concerned his pelvic and abdominal area. (Gosciniak Depo. 25:4-19, 26:6-12)  He was limited in what he was able to do for drill, and he did not lift weights anymore. (Gosciniak Depo. 45:11-19, 55:20-56:10) He also noticed depression set in once Joffrion returned to work, and he became aware of marital issues that arose between Joffrion and his wife. (Gosciniak Depo. 18:8-11, 19:9-11, 23:16-24:15, 24:19-25:3, 59:23-60:9, 73:2-74:24)  Joffrion became increasingly irritable and angry at work due to his ongoing pain and physical limitations. (Gosciniak Depo. 19:20-24, 21:3-22:15, 28:19-29:18, 60:10-61:10)  Following the crash, Gosciniak relied on Joffrion primarily for his opinion and technical expertise, rather than work ethic or physical abilities because of his injuries. (Gosciniak Depo. 19:20-20:1, 61:11-62:21, 75:23-76:21)

113.    Gosciniak, who was Joffrion's platoon sergeant from 2014 through 2018, testified many NCANG members like Joffrion remain in the Guard until age 60 to maximize their retirement benefits. (Gosciniak Depo. 39:18-40:13)   He also confirmed an individual must be a member of the National Guard to be eligible for a technician position through the DoD. (Gosciniak Depo. 9:19-10:6, 36:13-20, 77:5-79:10)

114.    Gosciniak testified the Army Physical Fitness Test ("APFT") that was in effect prior to his retirement in 2019 only had three events:  push-ups, sit-ups, and a two-mile run. (Gosciniak Depo. 52:13-53:4)  Joffrion had a profile that prevented him from doing sit-ups after the motorcycle crash. (Gosciniak Depo. 53:5-14)  Gosciniak opined that members of the National Guard should not be required to take the new six-event ACFT that is being implemented because of the extensive training it requires. (Gosciniak Depo. 70:2-24)  He confirmed a soldier can be discharged from the military if unable to pass the fitness test. (Gosciniak Depo. 54:19-23)

115.    Dr. Jesse A. Raley ("Dr. Raley") is a practicing psychiatrist in Columbia, South Carolina, who is board certified in general psychiatry, child and adolescent psychiatry, and forensic psychiatry. (Tr. 606:16-18; 607:22-608:2)  He was retained on behalf of Joffrion to perform a forensic evaluation of Joffrion to evaluate the emotional and mental damages caused by the motorcycle accident. (Tr. 620:15-25)

116.    Dr. Raley testified Joffrion was mentally and emotionally impacted by the motorcycle accident, and his situation was unique in that not only did he experience a new onset of symptoms after the crash, but he also had some untreated pre-existing mental health symptoms related to his combat trauma that were exacerbated by the crash. (Tr. 621:22-622:18)  The pre-existing symptoms that were significantly worsened by the crash became manifest through irritability, anger, nightmares, flashbacks, intrusive thoughts, restlessness, and hypervigilance. (Tr. 622:19-623:2, 623:20-24)  The new symptoms that arose became evident through anxiety, particularly when driving or riding in a vehicle, excessive and inappropriate guilt, due not only to survivor's guilt but also the effect the crash was having on his family dynamic, impaired sleep, largely due to flashbacks and nightmares about the crash, muscle tension due to anxiety and stress, and sexual difficulties due to his physical injuries.  (Tr. 623:15-625:24)

117.    As part of his forensic evaluation, Dr. Raley recommended treatment for Joffrion to pursue to address his symptoms. (Tr. 626:2-19)  Specifically, he recommended Joffrion continue with his individual psychotherapy to help him cope with the events of the accident itself, in addition to the impairments associated with the resulting physical disabilities he was experiencing, and he also recommended Joffrion continue with his psychiatric medications. (Tr. 626:2-19)  Dr. Raley explained Joffrion had been receiving good psychotherapy treatment through Plenty & Grace since the accident that was helping his symptoms improve, and he opined Joffrion should continue doing this. (Tr. 623:3-13, 633:25-634:2, 636:11-15)

118.    Lindsay Moore ("Moore") is a physician's assistant and certified life care planner, and was retained on behalf of Joffrion as an expert witness to prepare a life care plan and medical cost projection for his future medical treatment needs. (Tr. 708:6-16)  In preparing her plan, Moore reviewed medical records and depositions, interviewed Joffrion and his wife, and communicated with Joffrion's treating providers, Dr. Novick and Frink. (Tr. 711:2-713:4)  Moore explained the purpose of speaking with Joffrion's medical providers was to understand what future treatments would be reasonably necessary to treat his symptoms and keep him at a functional level to the best of his ability. (Tr. 712:24-713:4)   Moore also had Frink and Dr. Novick document their recommendations for Joffrion's future treatment needs for purposes of her life care plan. (Tr. 713:5-717:10; EX. 33)

119.    Moore's life care plan and cost projection Joffrion has asked this Court to award contains the following treatments:  two physical therapy evaluations over the course of his lifetime for his pelvic injury; counseling (individual or couples) once every two weeks for six months to begin with, and then once a month for at least fifteen years; physical therapy sessions (e.g. ultrasound, dry-needling, etc.) for his pelvic injury two times per week for four to six weeks on two occasions

over the course of his lifetime; one to two pelvic MRIs over his lifetime; visits with an orthopedic or general surgeon three to five times over his lifetime; up to two steroid injections to his pelvic floor over his lifetime; Zoloft two times per day for his PTSD and mental health symptoms; Trazadone once a day for PTSD and help sleeping; Flexeril and Naproxen on an as-needed basis for pelvic pain; and, an annual gym membership to help keep his pelvic and abdominal muscles reasonably active and conditioned. (EX. 33; Tr. 720:11-724:9)  All items in Moore's plan having to do with Joffrion's pelvic injury were recommended by Dr. Novick, and all items in her plan having to do with Joffrion's PTSD and mental health issues were recommended by Frink. (Tr. 715:20-717:10, 720:14-721:12, 721:13-25, 722:1-723:10, 724:2-9; EX. 33)  Moore relied on GoodRX, which is geographic region specific, to determine medication costs, and she testified utilizing retail costing is consistent with sound life care planning methodology. (Tr. 703:1-10)

120.    Moore used a life expectancy of 35.1 years for Joffrion, which is based on the life expectancy chart formulated by the Centers for Disease Control and Prevention ("CDC"), to calculate the projected future medical costs, as opposed to the life expectancy tables in the South Carolina Code of Laws. (Tr. 720:7-10; EX. 29)  This approach/methodology was utilized in a similar USPS accident case by the plaintiff, and accepted by the court.  *See Crimmins v. United States*, C/A No. 2:17-cv-3470-DCN, ECF 65 at ¶¶ 70–73 (Plaintiff's certified life care planner, Lindsay Moore, used the life expectancy chart formulated by the CDC to calculate projected future medical costs, and plaintiff's CPA, Tricia Yount, used the life expectancy tables codified in S.C. Code § 19-1-150 to calculate the present value of projected future medical costs based on Lindsay Moore's life care plan.).

121.    Should Joffrion receive all the medical treatments contained in Moore's life care plan, the projected future costs range from $83,811.24 to $140,846.96. (EX. 33)  Moore explained the range

of costs is to account for the range of costs in a community, as well as the fact that products can have different price points depending on where they are bought and sold. (Tr. 719:22-720:6)  She further explained how the lifetime cost she calculated takes into account not only the range in cost of a specific item, but also the frequency of being needed over a person's lifetime. (Tr. 691:15-25)

122.    Dr. Mark Stebnicki, Ph.D., LPC, DCMHS, CRC, CMCC ("Dr. Stebnicki") is a certified rehabilitation counselor who testified as a vocational expert on behalf of Joffrion. (Stebnicki Depo. 12:13-13:4)  Dr. Stebnicki holds a masters and Ph.D. in rehabilitation counseling, as well as a certificate in clinical military counseling. (Stebnicki Depo. 12:13-13:5)  He is also a licensed clinical mental health counselor, and a diplomate in clinical mental health counseling with a specialization in trauma. (Stebnicki Depo. 15:12-23)

123.    Dr. Stebnicki performed a vocational evaluation of Joffrion in light of his upcoming separation from the NCANG and corresponding loss of his DoD technician position. (Stebnicki Depo. 22:24-23:7; EX. 35)  As part of his evaluation, he conducted an in-person interview of Joffrion on November 23, 2021, and he reviewed many of his medical records, the deposition transcripts of Joffrion, Emanual, Gosciniak, Frink, and Dr. Novick, the trial testimony of Joffrion and Dr. Novick, as well as various other materials generated during the course of discovery in the case. (Stebnicki Depo. 27:7-28:6, 28:16-30:14)  Based on his vocational assessment, Dr. Stebnicki opined Joffrion's capacity for work is significantly limited due to the traumatic motorcycle accident, and he would not be employable in his recent occupations as a truck driver, truck mechanic, and vocational instructor. (Stebnicki Depo. 26:4-19)  He further opined Joffrion will require vocational technical training or a college degree to return to competitive employment in the civilian labor market. (Stebnicki Depo. 26:4-19)

124.    Dr. Stebnicki based his opinion on Joffrion's future employability primarily on the fact Joffrion's lifting restrictions associated with his core injury, his difficulty standing for extended periods of time, and his chronic pain which prevents him from climbing, balancing, stooping, kneeling, crouching, crawling, reaching, and handling certain things, are all specific worker traits integral to his current job performance that will present vocational hindrances in a future work setting. (Stebnicki Depo. 32:17-33:5, 37:23-38:15)  Dr. Stebnicki further testified Joffrion's pre-existing VA disability rating also poses a vocational hindrance that factors into his residual functional capacity and will adversely affect his future employability. (Stebnicki Depo. 33:2-34:14)  Dr. Stebnicki acknowledged that Joffrion likely went into his NCANG "hurt" upon his return from his last deployment, but he explained how the motorcycle crash multiplied and enhanced Joffrion's condition from a chronic pain standpoint, thus further reducing his residual functional capacity and rendering him unemployable in his current jobs in the civilian sector. (Stebnicki Depo. 34:20-36:11, 38:16-40:3, 45:2-46:24)

125.    Dr. Stebnicki testified Joffrion's current role as an instructor in the NCANG is essentially a job accommodation to help Joffrion abide by the limitations imposed by his core injury from the motorcycle accident. (Stebnicki Depo. 95:3-16)

126.    In addition to the vocational hindrances presented by Joffrion's current physical limitations, Dr. Stebnicki also opined Joffrion's mental health condition, specifically his complex PTSD, adversely affects his residual functional capacity, particularly from a productivity and safety standpoint, and will likely be a vocational hindrance to him working in a setting where he is around other people on a regular basis, as opposed to a setting where he works on objects and things like mechanics typically do. (Stebnicki Depo. 40:9-44:23)

127.    Dr. Stebnicki testified Joffrion's pre-existing traumatic brain injury ("TBI") from his combat duties, coupled with the fact he has only a high school education, will also be a vocational hindrance to him finding comparable employment in the private sector, particularly given the differences in job demands of being a mechanic for the military and working in customer service like so many civilian jobs require. (Stebnicki Depo. 46:25-48:22)

128.    Dr. Stebnicki opined that Joffrion's occupations as a transport truck driver and mechanic cannot be transferred to any other military or civilian occupations in light of his current condition due to the significant risk of re-injury. (Stebnicki Depo. 57:6-59:14)  He explained Joffrion might be able to find, without any additional schooling or vocational training, a job working in some type of position at a business such as Auto Zone, but this type of position, according to Dr. Stebnicki, would be fundamentally different from a career like he had through the NCANG and DoD, and would likely end up being only temporary for Joffrion. (Stebnicki Depo. 48:23-54:4)  Dr. Stebnicki emphasized that veterans with a VA disability rating of 60% or higher tend to have fewer job options in the private sector, and thus, are less likely to find gainful employment with time. (Stebnicki Depo. 53:16-57:5)  Dr. Stebnicki further testified that the majority of his clients with disability profiles comparable to Joffrion's end up not working at all despite their best efforts and intentions. (Stebnicki Depo. 60:10-62:8)  Joffrion has a VA disability rating of 90%. (Tr. 293:9-23)

129.    Dr. Stebnicki testified it was his understanding that Joffrion first sought treatment for his so-called sports hernia injury immediately after the motorcycle crash, but first sought surgical treatment of the injury in October 2019 with Dr. Novick. (Stebnicki Depo. 126:23-129:8)

130.    Dr. Stebnicki understood Joffrion initially filled out the functional capacity certificate to the best of his ability based on prior communications with Dr. Novick about his physical

limitations following his surgeries in 2019, and then sent the form to Dr. Novick for his consideration and execution. (Stebnicki Depo. 129:9-132:5)  Dr. Stebnicki did not have a problem with how this was done. (Stebnicki Depo. 131:20-23, 136:7-137:5)  He also testified that a certified disability assessment would not have provided him any additional relevant vocational information beyond what was contained in Joffrion's Functional Capacity Certificate. (Stebnicki Depo. 132:6-136:6)

131.    Mark Bokesch ("Bokesch") is a CPA who was retained on behalf of Joffrion to calculate certain financial losses arising from the motorcycle accident, specifically the value of his future medical costs, lost pre-trial and future DoD technician wages, lost 401(k) employer match, lost future National Guard wages, lost National Guard retirement pay, pre-trial mileage expenses, and lost household services. (Tr. 753:16-754:3; ECF 116, EX. 34)

132.    Bokesch calculated the present value of Joffrion's future medical costs based on Moore's medical cost projection. (Tr. 754:4-13; ECF 116, EX. 34)  To do so, he applied a growth/inflation rate based on the 10-year average of the Consumer Price Index numbers to the services and items in the plan, and projected those costs into the future according to Joffrion's life expectancy. (Tr. 754:25-755:12, 729:22-730:10)  He then calculated the present value cost of the plan using the current 10-year U.S. Treasury bond yield rate of 1.58 percent. (Tr. 755:11-756:4)  Based on this methodology, Bokesch determined the high end present value for Joffrion's future medical care costs to be $166,411 and the low end value to be $99,918. (ECF 116, EX. 34; Tr. 756:5-11)  Bokesch used a life expectancy of 33.69 years for Joffrion pursuant to the life expectancy tables codified in S.C. Code § 19-1-150. (Tr. 774:7-12; EX. 30)

133.    Bokesch calculated the value of Joffrion's lost future wages for his DoD technician position based on Joffrion's 2020 W-2, as well as the vocational assessment of Dr. Stebnicki, Joffrion's

vocational expert, concluding Joffrion's current job skills are not transferrable to another comparable occupation in the civilian sector. (Tr. 756:12-757:5)  Bokesch then factored in a 1.5 percent cost of living adjustment, which represented the 10-year average of the cost of living adjustments for federal employees, and projected Joffrion's future earnings out over 18 years to 2039, which is when Joffrion would have retired at age 62. (Tr. 757:6-18)  Bokesch then calculated the future value of Joffrion's lost future DoD technician wages to be $1,164,318, which becomes $972,266 when reduced to present value. (ECF 116, EX. 34; Tr. 6-22)  In calculating present value, Bokesch used a discount rate of 1.99 percent based on the 20-year treasury yield rate. (Tr. 757:6-18; ECF 116, EX. 34)  Bokesch testified Joffrion's effective income tax rate per his 2020 tax return was 16 percent, and explained that once this rate was applied to the present value figure of $972,266, the net amount of Joffrion's lost future DoD technician wages is $816,703. (Tr. 757:19-758:6; ECF 116, EX. 34)

134.    Bokesch also calculated the value of Joffrion's lost employer match contribution to his 401(k) plan through his DoD technician position. (Tr. 758:12-25)  Joffrion contributed 3% of his annual salary to his retirement plan each year, and his employer matched that 3% contribution. (Tr. 758:16-22)  Bokesch testified the lost employer match contribution, when reduced to present value, totals $29,167. (Tr. 758:19-25; ECF 116, EX. 34)

135.    Bokesch explained Joffrion will begin receiving disability payments once he loses his DoD technician job, and that these payments, which are calculated based on the high three-year average of the employee's salary according to the retirement estimate report published by the Federal Employee Retirement System ("FERS"), are paid out at 60% for the first 12 months and 40% thereafter for the employee's work life. (Tr. 759:1-760:5)  Had Joffrion been able to remain in the NCANG until age 60, his full retirement pay would have been $2,692 per month, but in light of

his early separation, his monthly payment will be reduced to $1,244 per month. (Tr. 762:17-763:4) Bokesch calculated the disability payments out until the age of 62 for Joffrion, and then applied a 1.5% cost of living adjustment, which resulted in a gross future value of $460,429. (Tr. 759:20-760:5; ECF 116, EX. 34)  When adjusted to present value using the 20-year U.S. Treasury bond rate of 1.99%, the figure becomes $386,236 and then reduces to $324,438 when adjusted for tax effect. (Tr. 760:4-5, 771:2-8; ECF 116, EX. 34)  Bokesch testified the disability payments qualify as a mitigating factor and should be subtracted from the lost earning capacity damages awarded to Joffrion for his DoD technician job. (Tr. 760:12-14)

136.    Bokesch also calculated the value of Joffrion's lost future NCANG wages based on his inability to remain in the NCANG until age 60. (Tr. 760:15-762:16; ECF 116, EX. 34)  In doing so, he relied on the average of Joffrion's NCANG wages for the previous five years according to his W-2s, and then projected his losses out until age 60. (Tr. 760:15-761:3)  He then factored in a cost of living adjustment of 1.7 percent and arrived at a future value of $150,757, a present value of $128,391, and an after-tax value of $107,848. (Tr. 760:18-761:21; ECF 116, EX. 34)  However, the government's expert, Yount, in calculating Joffrion's lost future National Guard wages, utilized a slightly different methodology in determining his salary to be included in the calculation, and her methodology yielded a future value of $162,766, and a present value of $140,282. (Tr. 761:22-762:15; EX. 44)   Bokesch testified he accepted and adopted Yount's starting salary methodology and her resulting calculation for purposes of determining Joffrion's lost future National Guard wages. (Tr. 762:2-9)

137.    Once the mitigating factor of Joffrion's reduced retirement benefits that he will begin receiving upon his separation from the NCANG is accounted for, Bokesch determined Joffrion's National Guard lost retirement pay to be $370,627, which has a present value of $226,515. (Tr.

763:20-764:8; ECF 116, EX. 34)  When adjusted for tax effect, the number becomes $190,273. (Tr. 771:9-18; ECF 116, EX. 34)

138.    Bokesch calculated the value of Joffrion's pre-trial mileage for his medical appointments by multiplying his incurred mileage of 7,120.50 miles by the average Internal Revenue Service ("IRS") business mileage rate of 0.575 per mile for the timeframe during which the visits occurred. (Tr. 764:12-765:2, 780:1-23)  Bokesch used the standard IRS business mileage rate rather than the lower medical mileage rate to account for the fixed costs associated with operating a vehicle, such as periodic oil changes, other routine maintenance, and depreciation. (Tr. 780:1-781:2) Bokesch testified the value of Joffrion's mileage costs is $3,983. (Tr. 764:23-765:2; ECF 116, EX. 34)

139.    Bokesch calculated the value of Joffrion's lost pre-trial DoD technician wages based on his having missed 1,041 hours from work prior to trial multiplied by his hourly pay rate at work. (Tr. 765:3-18)  These figures were based on a report provided from Joffrion's employer as well as information provided by Joffrion himself. (Tr. 765:3-18)  Bokesch testified Joffrion's lost pre-trial DoD technician wages total $27,217, which becomes $22,862 once adjusted for income taxes. (Tr. 765:14-18; ECF 116, EX. 34)

140.    Bokesch calculated the value of Joffrion's lost household services by gathering information from him about the type of services he performed around the house prior to the accident. (Tr. 765:25-766:10)  To obtain this information, he had Joffrion complete a questionnaire detailing the type of services performed and time spent doing so, and he also spoke with Joffrion on the phone about the information. (Tr. 766:3-10)  Based on the information provided, Bokesch determined Joffrion performed an average of 17.27 hours of weekly household services prior to the accident and an average of 5.17 hours afterwards, resulting in a weekly loss of 12.1 hours.  (Tr. 766:11-16) Bokesch explained that the weekly loss will become 8.1 hours in 2025, when Joffrion's son Royce

turns 18 and presumably moves out of the house. (Tr. 766:17-21)  He valued the lost household services at an hourly rate ranging from $12.73 to $14.91 depending on the category of tasks being valued, which were the rates applicable to Fayetteville, North Carolina, provided by the United States Bureau of Labor Statistic's "Dollar Value of Day" data. (Tr. 766:22-767:15)   When annualized, Bokesch testified the pre-trial value of Joffrion's lost household services is $53,348, and the value of future lost household services, when carried out over the course of his life expectancy, totals $149,023. (Tr. 767:12-768:5)  When added together, the total value of Joffrion's lost household services is $202,371. (Tr. 768:4-5)   Bokesch explained Yount used a different method to calculate the lost future household services component, which consisted of incorporating an inflation rate that increases over time but then stopped her calculation at Joffrion's functional life, as opposed his statutory life expectancy. (Tr. 768:3-22)   Yount's methodology yielded higher figures than Bokesch's, and Bokesch testified he considered Yount's methodology sound and adopted her figures for purposes of his overall calculations. (Tr. 768:19-769:4)  According to Bokesch, Yount calculated the value of Joffrion's lost household services to be $287,742, which becomes $221,961 when reduced to present value. (Tr. 769:5-10; ECF 116, EX. 34)

141.    Bokesch testified the after-tax value of Joffrion economic damages, when incorporating the high value of Moore's medical cost projection, totals $1,234,770, and the after-tax value of Joffrion's economic damages, when incorporating the low value, totals $1,168,277. (Tr. 772:3-22; ECF 116, EX. 34)

142.    Yount is a forensic accountant who was retained by the government to calculate the value of Joffrion's before-trial financial losses and the present value of his after-trial financial losses. (Tr. 592:13-24)

143.    Yount calculated the value of Joffrion's lost NCANG earnings using his 2021 drill rate of $143.23 for his weekend and annual training, and by assuming a separation date of November 1, 2021. (Tr. 593:19-25)  She then factored in an annual cost of living adjustment until Joffrion turned 60-years-old before reducing the sum to present value.  (Tr. 593:22-594:4)  On this basis, Yount calculated Joffrion's before-trial loss to be $877.00, and his after-trial loss to be $139,405. (EX. 44)  She testified Joffrion's total lost NCANG earnings total to $140,282. (Tr. 594:5-8; EX. 44)

144.    Yount calculated the value of Joffrion's lost pre-trial wages from his DoD technician job to be $27,000. (Tr. 594:9-19; EX. 44)  She did not consider any future lost wages based on the assumption Joffrion will be able to find a new job earning at least equal pay following his separation from his DoD technician position. (Tr. 594:20-595:4, 601:22-602:14)

145.    Yount calculated the value of disability benefits Joffrion will begin receiving upon his separation from the NCANG and his DoD technician position based on his average annual pay of $58,895. (Tr. 595:5-17)  Yount testified these payments will be made at 60 percent of Joffrion's annual salary for the first year, and at 40 percent of his salary thereafter until he turn 62, at which time he will begin receiving his full retirement payments. (Tr. 595:11-15)  Yount calculated this sum, which she characterized as a credit, to be $412,806. (Tr. 595:18-21)

146.    Yount also calculated the value of Joffrion's lost National Guard retirement benefits.  She testified he will be eligible to begin receiving these retirement benefits at age 60, and the benefits will be based on his current income and his years of service. (Tr. 596:1-5)  At age 60, Joffrion will begin receiving approximately $15,000 per year, but had he been able to remain in the National Guard until that time, he would have received approximately $32,000 per year. (Tr. 596:6-8)  Yount testified the value of Joffrion's lost National Guard retirement benefits is represented by the differential between the sum he would have been eligible to receive had he remained in the

National Guard, and the amount he will receive upon his upcoming separation, which she calculated be $208,581. (Tr. 596:8-15; EX. 44)

147. Yount relied upon the life care plan prepared by Reavis, the government's life care planning expert who did not testify at trial, to calculate Joffrion's future medical care costs. (Tr. 596:16-597:4)  Based on Reavis' plan, Yount determined the present value of Joffrion's future medical care to be $125,331. (EX. 44)

148. Yount relied upon data included in the report of Joffrion's economic expert, Bokesch, to calculate the value of Joffrion's lost household services, though in contrast to Bokesch, she used an hourly rate value of $10.80 for the Fayetteville, North Carolina, area for the year 2015, and then adjusted that value for inflation over the course of a "full-function" life expectancy. (Tr. 597:11-598:3)  Through this approach, Yount calculated the value of Joffrion's pre-trial lost household services to be $44,904, and his future lost household services to be $177,057, which yields a combined value of $221,961. (EX. 44)

149. Yount calculated the value of Joffrion's mileage associated with his medical visits, which she calculated at .20 per mile based on the IRS medical reimbursement rate, to be $1,390. (Tr. 598:4-11, 15-21)

150. Yount testified the present value of Joffrion's total economic loss is $311,956. (Tr. 598:22-25)

151. Dr. Barry Levin ("Dr. Levin") is a neurologist employed with Emerson Hospital in Concord, Massachusetts, and he testified by video deposition as an expert for the government in the field of neurologic medicine. (Levin Depo. 6:16-7:8, 7:17-21)

152. Dr. Levin never evaluated Joffrion as a patient, or performed an independent medical examination of him. (Levin Depo. 52:10-25)  He formulated opinions in the case based on his

review of certain medical records and depositions provided to him by the government. (Levin Depo. 49:7-12)

153.    Dr. Levin acknowledged the motorcycle collision was a "high kinetic and traumatic event." (Levin Depo. 57:17-20)  He testified the crash was the type of traumatic event that can cause a pre-existing condition such as degenerative arthritis in the thoracic spine to become symptomatic, and it could have caused Joffrion's thoracic compression fractures to become painful. (Levin Depo. 60:4-61:10)

154.    Dr. Levin did not know how the 2010 IED blast Joffrion was involved in compared with the motorcycle crash in 2015, or which event was more severe. (Levin Depo. 64:8-11)  He assumed Joffrion's VA disability rating for PTSD and TBI was related to the 2010 IED blast. (Levin Depo. 65:3-14)

155.    Dr. Levin acknowledged Joffrion was diagnosed with a right wrist fracture following the motorcycle crash, and he was not aware of any evidence to indicate Joffrion had pain or other deficits in his right wrist prior to the crash. (Levin Depo. 71:5-8, 72:12-18)  He acknowledged Joffrion's work exacerbated his wrist pain from the crash. (Levin Depo. 74:5-75:5)

156.    Dr. Levin did not know what was causing the numbness and tingling in Joffrion's mid-back following the motorcycle crash, but he hypothesized it was due to subcutaneous sensory nerves being injured by superficial trauma. (Levin Depo. 75:8-76:12)  Dr. Levin admitted this injury, which he characterized as "relatively mild," would have been caused by the crash if his hypothesis was correct. (Levin Depo. 76:8-16)  Dr. Levin admitted he was not aware of any evidence Joffrion had pain in his mid or lower back anytime during 2015 that limited him physically in any respect. (Levin Depo. 82:16-83:2)  He further admitted he had not seen any

evidence to indicate Joffrion's thoracic pain fully resolved following the crash. (Levin Depo. 77:6-20)

157.    Dr. Todd Heniford ("Dr. Heniford") testified as an expert for the government in the field of surgical medicine. (Tr. 790:24-791:4)  Dr. Heniford never saw Joffrion or treated him as a patient, but rather reviewed his medical records, depositions, and other case information to formulate his opinions. (Tr. 810:17-811:5, 791:5-792:14)  Dr. Heniford acknowledged he operates only on a very small percentage of his patient population with core injuries like Joffrion's because the injury is so uncommon. (Tr. 813:7-12)

158.    Dr. Heniford knows Dr. Novick and considers him a "great surgeon." (Tr. 809:17-810:4)

159.    Dr. Heniford, like Dr. Novick, agreed the term "sports hernia" is really a misnomer for the injury it characterizes.  He testified a sports hernia injury is the same thing as a "core injury." (Tr. 790:6-12, 792:15-22)  Dr. Heniford testified the core injury is most often caused by use or overuse, but he could not testify the injury is unable be caused by trauma. (Tr. 795:3-11, 799:3-6, 813:13-17)

160.    Dr. Heniford testified he typically tells patients with core injuries they can expect a 90 percent return to full activities following surgical repair. (Tr. 794:9-20)

161.    Dr. Heniford did not opine Joffrion's core injury was not caused by the motorcycle accident; rather, he opined only that the injury on Joffrion's left side appeared to be a new injury. (Tr. 814:12-23)  However, Dr. Heniford acknowledged that he, unlike Dr. Novick, never reviewed any of the CT scan imaging of Joffrion's abdomen or pelvic area from GSRMC, and he also acknowledged Joffrion's records from GSRMC from the day of the accident indicate Joffrion was complaining of pain in his left hip and leg upon admission to the hospital. (Tr. 815:13-816:12)

162.    Dr. Wilfred Hynes ("Dr. Hynes") testified as an expert for the government in the field of pain management. (Tr. 833:2-9)  Dr. Hynes is an anesthesiologist employed with Tufts Medical Center in Boston, Massachusetts. (Tr. 828:22-23, 829:23-25)   Dr. Hynes was hired by the government to review Joffrion's medical records. (Tr. 860:12-17)

163.    Dr. Hynes acknowledged the motorcycle crash was a high velocity, high kinetic event, and Joffrion was injured as a result. (Tr. 869:3-9)

164.    Dr. Hynes opined Joffrion suffered soft tissue injuries to his mid-back as a result of the crash. (Tr. 860:25-861:17, 862:17-24)

165.    Dr. Hynes opined Joffrion's right wrist fracture healed with conservative measures, but that his work exacerbated his wrist pain. (Tr. 863:7-22)

166.    Dr. Hynes is not a pelvic or sports hernia specialist, and he deferred to Joffrion's surgeon on the nature and extent of that injury. (Tr. 866:5-867:16)

## II.    CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, & Applicable Law

1.    The United States is the proper defendant in this action pursuant to the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671–2680.  Cole was operating a motor vehicle within the course and scope of her federal employment with the USPS at the time of the accident on September 12, 2015.  *See* 28 U.S.C. § 2679(b)(1).

2.    Pursuant to 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3.01(A)(1) (D.S.C.), venue is proper in this Court because a substantial part of the events or omissions giving rise to Joffrion's claims occurred in the Florence Division of the United States District Court for the District of South Carolina.

3.      Plaintiff filed his complaint on December 20, 2018, and has satisfied the administrative requirements of the FTCA.

4.      The FTCA imposes tort liability on the United States only "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and only to the extent that "a private person[ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1). The FTCA is a limited waiver of sovereign immunity, and therefore courts must strictly interpret and apply it. *United States v. Sherwood*, 312 U.S. 584, 590 (1941); *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990).

5.      Under the FTCA, procedural matters are governed by federal law; however, the FTCA directs courts to examine substantive legal issues pursuant to the laws of the place where the act or omission occurred. *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991) ("A plaintiff has a[] FTCA cause of action against the government only if [he] would also have a cause of action under state law against a private person in like circumstances.  State law determines whether there is an underlying cause of action . . . ."); *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 757 (4th Cir. 1990) ("United States liability under the FTCA depends upon state law.").  Here, Joffrion alleges Cole acted negligently while driving in Horry County.  Therefore, South Carolina law, including that regarding negligence actions, controls.  *See* 28 U.S.C. § 1346(b)(1).

6.      To establish a cause of action in negligence, three essential elements must be proven: (1) a duty of care owed by the defendant to the plaintiff; (2) the breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty. *Bishop v. S.C. Dep't of Mental Health*, 502 S.E.2d 78, 82 (S.C. 1998)

7.     Under the doctrine of comparative negligence, "a plaintiff in a negligence action may recover damages if his or her negligence is not greater than that of the defendant." *Nelson v. Concrete Supply Co.*, 399 S.E.2d 783, 784 (S.C. 1991).

### B. Liability

8.     Prior to trial, the government stipulated to its liability for the accident and the absence of any comparative negligence by Joffrion. (ECF 78)  Accordingly, the only issue for the Court to decide is the damages to which Joffrion is entitled.

### C. Damages

9.     Pursuant to 28 U.S.C. § 2675, Joffrion is limited to recovering the amount of damages sought in his administrative complaint.  Joffrion's initial administrative complaint, filed on August 3, 2017, sought damages in the amount of $1,250,000.  On April 10, 2018, Joffrion filed an amended administrative complaint increasing the damages sought to $10,000,500.  The government has not opposed Joffrion's amended administrative complaint.  Accordingly, Joffrion is limited to recovering the amount of damages sought in his amended administrative complaint, which is $10,000,500.

10.     The elements of damage that can properly be considered in determining the amount a plaintiff is entitled to recover include past and future medical expenses, past and future loss of income, loss of family services, pain and suffering, loss of enjoyment of life, mental anguish, and disfigurement. *Boan v. Blackwell*, 541 S.E.2d 242 (S.C. 2001); *Woodberry v. United States*, C/A No. 2:12-1872-DCN, 2015 WL 4395154 (D.S.C. July 16, 2015).  "The existence or amount of damages may not be left to conjecture, speculation[,] or guess." *Pearson v. Bridges*, 544 S.E.2d 617, 619 n.5 (S.C. 2001).

11.     A plaintiff in a negligence action is entitled to recover all damages proximately resulting from a defendant's negligent acts, including the aggravation of pre-existing conditions. *Watson v. Wilkinson Trucking Co.*, 136 S.E.2d 286, 291 (S.C. 1964); *Roberson v. United States*, C/A No. 4:09-00491-RBH, 2010 WL 4822325 (D.S.C. Nov. 22, 2010). "Proximate cause is established by proof of actual and legal causation." *Hill v. York County Sheriff's Dep't*, 437 S.E.2d 179, 182 (S.C. Ct. App. 1993). Actual causation is proved by establishing the injury would not have occurred 'but for' the defendant's negligence, while legal causation is proved by establishing foreseeability. *Bramlette v. Charter-Medical-Columbia*, 393 S.E.2d 914, 916 (S.C. 1990). A "defendant may be held liable for anything which appears to have been a natural and probable consequence of [her] negligence." *Id.* "Proximate cause does not mean the sole cause; . . . [t]he defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." *Small v. Pioneer Mach. Inc.*, 494 S.E.2d 835, 843 (S.C. Ct. App. 1997).

12.     "Future damages are only recoverable if they are 'reasonably certain' to occur." *Woodberry* at 4; *Pearson*, 544 S.E.2d at 619. "A party need not, however, prove future damages in a personal injury case to a mathematical certainty." *Campbell v. Paschal*, 347 S.E.2d 892, 901 (S.C. Ct. App. 1986).

13.     Joffrion was 44-years-old at the time of trial. (Tr. 303:10-11) According to the life expectancy tables found at S.C. Code § 19-1-150, Joffrion's projected life expectancy is 33.69 years. (Tr. 774:7-12; EX. 30) This code section also provides the Court should consider other evidence of Joffrion's health, constitution, and habits in determining his life expectancy. Having considered the evidence presented in this case, including evidence of remote pre-existing medical conditions and Joffrion's general health and fitness level, the Court finds the life expectancy tables'

estimate of Joffrion's life expectancy—33.69 years—to be a reasonable estimate and will use that figure when determining his future damages.

14.    The Court now considers the amount of damages to which Joffrion is entitled.

### 1.  Medical Expenses

15.    "[I]n personal injury actions, the plaintiff may recover for the necessary and reasonable expense caused by the injury such as amounts necessarily paid for medicine, medical attendance, hospital expense and care and nursing." *Sossamon v. Nationwide Mut. Ins. Co.*, 135 S.E.2d 87, 91 (S.C. 1964).  "A plaintiff in a personal injury action seeking damages for the cost of medical services provided to him as a result of a tortfeasor's wrongdoing is entitled to recover the reasonable value of those medical services, not necessarily the amount paid." *Haselden v. Davis*, 579 S.E.2d 293, 295 (S.C. 2003).

### a.  Past Medical Expenses

16.    At trial, Joffrion presented evidence of past medical expenses related to the accident totaling $251,665.58. (EX. 32; Tr. 378:6-383:16)  This sum consisted of the following expenses from the following providers:

| Medical Provider | Total Amount of Bills |
|---|---|
| **Rocky Mount Holdings, LLC (helicopter)** | $33,798.72 |
| *Rocky Mountain Holdings 00010 - 00013* | |
| **Grand Strand Regional Medical Center** | $79,714.72 |
| *GSRMC 00052 – 00058* | |
| **Carolina Radiology** | $2,230.00 |
| *Carolina Radiology 00001 – 00002* | |
| **Cary Orthopaedic & Sports Medicine** | $773.00 |
| *Cary Ortho 00034* | |
| **Fayetteville Orthopaedics** | $24,131.80 |
| *Fayetteville Ortho 00093 – 00100, 00116 – 00117, 0174 – 00177, 00192 – 00206* | |
| **Pivot Physical Therapy** | $6,024.00 |

| | |
|---|---|
| *Pivot PT 00094 – 00102, 00122 – 00210* | |
| **Valley Radiology, PA** | $3,461.00 |
| *Valley Radiology 00001 – 00002* | |
| **Valley Regional Imaging** | $2,231.00 |
| *Valley Regional 00003 – 00004* | |
| **Wake Radiology** | $2,105.00 |
| *Wake Radiology 00003 – 00004* | |
| **Veterans Affairs** | $10,581.95 |
| *Joffrion Admin Documents_00051, 00750, BCBS Subrogation 00014 - 00015* | |
| **Dr. Thomas L. Novick / Duke Health** | $48,383.31 |
| *Duke Health – Novick 00236 – 00277, 00282 – 00321, 00325* | |
| **Duke Reference Lab Therapy** | $1,192.00 |
| *Duke Health – Novick 00261, 00269, 00271, 00275* | |
| **Behavioral Health Care (Cape Fear Valley Health)** | $555.00 |
| *Cape Fear Valley Health 00016 – 00017* | |
| **Pinehurst Surgical** | $11,067.00 |
| *Pinehurst Surgical 00002 – 00009, 00052 – 00069* | |
| **Plenty and Grace Counseling** | $19,770.00 |
| *Plenty & Grace 00181 – 00184* | |
| **Regional Anesthesia, PLLC** | $5,400.00 |
| *BCBS Subrogation 00027* | |
| **Medications** | $247.08 |
| *Joffrion Admin Documents_00732 - 00747* | |
| **TOTAL** | $251,665.58 |

Additionally, Joffrion seeks mileage reimbursement in the amount of $3,983 for the numerous trips he made to and from his various providers for accident-related treatment. (Tr. 383:17-23)

17.      At trial, the government challenged only the past medical expenses related to Dr. Novick's treatment of Joffrion beginning in 2019, including the surgeries for his core injury repair in October and December 2019, and the Supartz injections provided by Dr. McBrayer to Joffrion's right knee, as not being related to the accident. The government based its challenge to these particular expenses from Duke Health on the fact Joffrion tore his left bicep while attempting to prevent a

tire from falling at work in April 2019, thus allegedly injuring his left abdominal muscles and groin as a result of the same incident. The government based its challenge to the expenses for the Supartz injections Joffrion received in his knee following the accident on the fact he had already begun receiving these injections from Dr. McBrayer prior to the accident for his pre-existing arthrosis in the knee.

18.     Having considered and weighed the relevant evidence on these respective issues, in particular the testimony of Dr. Novick, who was Joffrion's treating surgeon and operated on him twice, the Court finds Joffrion has proven by a preponderance of the evidence his treatment with Dr. Novick in 2019 and beyond was proximately caused by the motorcycle accident. While the government presented testimony from its expert, Dr. Heniford, that the injury to Joffrion's left side was new and did not occur until sometime after his MRI in May 2016, Dr. Novick testified otherwise—that Joffrion's left-sided injury was merely the natural progression of the core injury caused by the accident. (Tr. 578:8-14) Dr. Novick testified he had seen this type of progression with core injuries on multiple occasions with other patients as well. (Tr. 578:8-14) Dr. Novick also based his opinion in part upon the CT scans of Joffrion's pelvic area from GSRMC on the day of the accident, which Dr. Heniford had not reviewed. (Tr. 557:13-558:11) In evaluating the divergent opinions offered by Dr. Novick and Dr. Heniford, the Court concludes Dr. Novick, who actually treated Joffrion and operated on him twice, to be the most reliable source of information with respect to the cause of Joffrion's core injury. In addition to the medical evidence presented, Joffrion also testified he did not experience any new or different pain in his abdomen or groin area after the incident in which he tore his bicep. (Tr. 348:22-349:11, 486:10-19)

19.     With respect to the post-accident Supartz injections Joffrion received in this right knee, the Court finds, based on the totality of the evidence, the motorcycle accident most likely aggravated

Joffrion's pre-existing arthrosis in that part of his body.  Joffrion testified his right knee was constantly painful and swollen after the accident, which was not the case beforehand when his knee would typically only bother him following significant running as part of his NCANG fitness duties. (Tr. 370:8-22)  Following the accident, he struggled to go on short walks with his wife and dog due to his knee pain and the change in his gait. (Tr. 370:11-22)  Emanuel testified Joffrion's gait changed after the accident and he walked with a hitch, and Burgess testified Joffrion frequently complained of knee pain after the collision. (Emanuel Depo. 38:10-21, 33:4-24; Burgess Depo. 55:16-22, 71:15-72:5)  Misty offered similar testimony concerning her husband's right knee.  The Supartz injections Joffrion seeks as part of accident-related damages are limited to those he received between the accident in September 2015 and October 2021, roughly one year following Joffrion's last visit with Dr. Novick.  He does not seek damages for any future knee injections he might receive.  For these reasons, the Court concludes the injections proximately resulted from the aggravation of Joffrion's pre-existing arthrosis, and are thus recoverable as part of his past medical expenses.  *See Watson v. Wilkinson Trucking Co.*, 136 S.E.2d 179, 228 (S.C. 1964) (noting a plaintiff in a negligence action is entitled to recover all damages proximately resulting from a defendant's negligent acts, including the aggravation of pre-existing conditions.)

20.     Accordingly, the Court awards Joffrion the full amount of past medical expenses submitted totaling $251,665.58.  The Court also awards Joffrion $3,983 in associated mileage for his medical visits.

### b.  Future Medical Expenses

21.     Joffrion seeks damages in the amount of $166,411 for his anticipated future medical expenses.  This amount is based upon Moore's life care plan and Bokesch's calculations to account for inflation and present-day value.  "Future damages are only recoverable if they are 'reasonably

certain' to occur." *Pearson*, 544 S.E.2d at 619. "A party need not, however, prove future damages in a personal injury case to a mathematical certainty." *Campbell*, 347 S.E.2d at 901.

22.     The future medical care items included in Moore's plan are as follows: two physical therapy evaluations over the course of his lifetime for his pelvic injury; counseling (individual or couples) once every two weeks for six months to begin with, and then once a month for at least fifteen years; physical therapy sessions (e.g. ultrasound, dry-needling, etc.) for his pelvic injury two times per week for four to six weeks on two occasions over the course of his lifetime; one to two pelvic MRIs over his lifetime; visits with an orthopedic or general surgeon three to five times over his lifetime; up to two steroid injections to his pelvic floor over this lifetime; Zoloft two times per day for his PTSD and mental health symptoms; Trazadone once a day for PTSD and help sleeping; Flexeril and Naproxen on an as-needed basis for pelvic pain; and, an annual gym membership to help him keep his pelvic and abdominal muscles reasonably active and conditioned. (EX. 33; Tr. 720:11-724:9)  All items in Moore's plan having to do with Joffrion's pelvic injury were recommended by Dr. Novick, and all items in her plan having to do with Joffrion's PTSD and mental health issues were recommended by Frink. (Tr. 715:20-717:10, 720:14-721:12, 721:13-25, 722:1-723:10, 724:2-9; EX. 33)  Joffrion testified that of the various physical injuries he received in the motorcycle accident, the pelvic injury still bothers him the most, and he likened his current symptoms to being stabbed with a knife or ice pick in that area. (Tr. 372:23-373:12) According to Dr. Novick, Joffrion is likely to always have somewhat of a problem with his core injury in the future, and he recommends that Joffrion not be inactive moving forward, but continue with certain non-impact physical activities, such as swimming or using a stationary bike or elliptical machine, to maintain a reasonable level of physical conditioning. (Tr. 549:12-550:3) Joffrion testified he intends to follow Dr. Novick's recommendations moving forward and try to

avoid any activities that might reinjure his core area. (Tr. 373:13-16)  With regard to his PTSD and mental health issues, Joffrion continues to take the medications he was prescribed following the crash, including Zoloft and Trazadone, and he and his wife Misty both testified they are still attending counseling sessions at Plenty & Grace, which have been helpful to the family. (Tr. 362:16-22, 651:15-652:8).  Joffrion intends to keep doing so moving forward, which Dr. Raley has also recommended. (Tr. 362:23-25, 636:11-16).   Accordingly, the Court finds all of the future treatment items contained in Moore's plan are reasonable, necessary, and reasonably certain to occur in the future.  The government did not present a life care planning expert at trial; however, it did present testimony from its economist, Yount, that the present value of Joffrion's future medical expenses should be $125,331, as opposed to $166,411. (Tr. 596:16-597:4; EX. 44) Having considered and weighed the relevant evidence, the Court finds that $166,411 is the appropriate measure of damages for Joffrion's future medical expenses, and it awards this amount.

### 2.  Lost Wages / Lost Earning Capacity

#### a.  Lost Pre-Trial DoD Technician Wages

23.     Joffrion seeks to recover the pre-trial wages he lost from his technician position while unable to work from September 14, 2015, to November 12, 2015, immediately after the accident, as well as the wages he lost following his return to work because of ongoing medical and other accident-related appointments and treatments with Fayetteville Orthopaedics, Cary Orthopaedic, Pivot Physical Therapy, Cape Fear Valley Behavioral Health, Plenty & Grace, Pinehurst Surgical, Duke Health and his attorneys. (Tr. 392:20-393:24; EX. 37: Joffrion Discovery Documents 00313-00329; EX. 36: Joffrion Admin Documents_00760-_00806)  The parties' experts agreed that Joffrion's pre-trial lost wages were $27,217, which becomes $22,862 once adjusted for income taxes; accordingly, the Court awards Joffrion $22,862. (Tr. 594:9-19; ECF 116, EX. 34; EX. 45)

### b.  Future Earnings Damages

24.    Joffrion seeks damages for the earnings he will lose in the future upon his separation from the NCANG and his DoD technician position on April 15, 2022.  These future earnings damages Joffrion seeks consist of his lost future DoD technician wages, lost 401(k) employer match, lost future NCANG wages, and lost NCANG retirement pay.  "Loss or impairment of earning capacity, consequent to the injuries to the person, is a proper element of compensation." *Matthews v. Porter*, 124 S.E.2d 321,328 (1962).  In order to award damages for loss of earning capacity, the Court must determine, from the evidence, Joffrion's ability to work following the accident.  *See Woodberry* at 11.

### i.  Lost Future DoD Technician Wages

25.    With respect to Joffrion's ability to work following his separation from the NCANG on April 15, 2022, the Court finds, based on the totality of the evidence, that Joffrion most likely will not be able to find comparable employment in the civilian sector.  Though Joffrion testified he plans to try to find a less physically demanding job in the civilian sector—and the Court finds this testimony credible—the Court concludes that his limited formal education, when combined with his long-established skill set as a mechanic and truck driver, both of which are physically demanding positions, his current 90% VA disability rating, and his current physical and mental limitations from the motorcycle accident, will present significant vocational hindrances which will greatly impede his ability to obtain viable work in the future. (Tr. 410:24-411:25, Stebnicki Depo., 32:17-33:5, 37:23-38:15, 33:2-34:14)   On this basis, the Court concludes Joffrion is 100% vocationally disabled.

26.    Because the Court concludes that Joffrion will be 100% vocationally disabled for the remainder of his life, he is entitled to damages for his future loss of earning capacity.  Joffrion will

be involuntarily separated from the NCANG as a result of his core injury and associated physical limitations effective April 15, 2022, and once this separation occurs, he will lose his technician job and the income it provides. (EX. 45; Tr. 397:18-24)  Bokesch calculated the value of these lost future earnings to be $816,703 based Dr. Stebnicki's opinion Joffrion is vocationally disabled, Joffrion's now-established separation date of April 15, 2022, and the assumption Joffrion would continue working until age 62.   (ECF 116, EX. 34; Tr. 759:16-760:5)   The Court finds the methodology used by Bokesch, which is adjusted for income tax effect, to be reliable in calculating Joffrion's future technician wages, and the government did not present any expert testimony of its own on this component of Joffrion's damages.  Accordingly, the Court awards Joffrion $816,703 in lost future technician wages.

### ii.  Lost Future 401(k) employer match

27.     As a consequence of losing his technician position, Joffrion also seeks $29,167 in damages for the employer contributions he would have received to his 401(k) had he continued working until age 62.  Joffrion contributed 3% of his annual salary to his retirement plan each year, and his employer matched that 3% contribution. (Tr. 758:16-22)    Bokesch testified the lost employer match contribution, when reduced to present value, totals $29,167, and the government has not challenged this calculation or presented any expert testimony of its own, aside from that of Yount, who testified she simply assumed Joffrion would be able to find work in the future, to challenge this component of Joffrion's damages. (Tr. 758:19-25; EX. 34)  Accordingly, the Court awards Joffrion $29,167 for his lost 401(k) employer match contributions.

### iii.     (Less) Disability Payments

28.     Joffrion will start receiving disability benefits once he loses his technician position, and these future payments constitute a mitigating factor that will reduce the value of Joffrion's future

technician wage damages.  Bokesch calculated the value of Joffrion's disability benefits based on the high three-year average of Joffrion's technician salary according to the retirement estimate report published by FERS, which are paid out at 60% for the first 12 months and 40% thereafter for the employee's work life. (Tr. 759:1-760:5)  Had Joffrion been able to remain in the NCANG until age 60, his full retirement pay would have been $2,692 per month, but in light of his early separation, his monthly payment will be reduced to $1,244 per month. (Tr. 762:17-763:4)  Bokesch calculated the disability payments out until the age of 62 for Joffrion, and then applied a 1.5% cost of living adjustment, which resulted in a gross future value of $460,429. (Tr. 759:20-760:5; ECF 116, EX. 34)  When adjusted to present value using the 20-year U.S. Treasury bond rate of 1.99%, the number becomes $386,236, and then reduces to $324,438 when adjusted for tax effect. (Tr. 760:4-5, 771:2-8; ECF 116, EX. 34)

### iv.  Lost Future National Guard Wages

29.     In calculating Joffrion's lost future NCANG wages, Bokesch and Yount used slightly different methods to determine Joffrion's starting salary.  (Tr. 762:2-5)  According to Bokesch's calculations, the future value of Joffrion's lost future wages is $150,757, and the present value is $128,391. (ECF 116, EX. 34)  According to Yount, who assumed a separation date of November 1, 2021, the future value is $162,766, and the present value is $140,282. (Tr. 593:19-25; EX. 44) At trial, Bokesch testified he was willing to accept Yount's calculations for the purpose of determining Joffrion's lost future NCANG wages; however, since then, Joffrion has received his formal order of separation from the NCANG confirming his separation date to be April 15, 2022, and Bokesch has revised his calculations based on this established date. (ECF 116, EX. 34)  When adjusted for tax effect, the number becomes $107,848.  (ECF 116, EX. 34)  Accordingly, the Court

concludes Bokesch's updated calculations are the most accurate and reliable for determining this component of damage, and awards Joffrion $107,848 for his lost future NCANG wages.

### v.  Lost National Guard Retirement Pay

30.     Bokesch calculated the value of Joffrion's lost NCANG retirement pay based on the difference between the monthly payments Joffrion would have received had he remained in the National Guard until age 60, and the reduced monthly payments he will begin receiving once his separation becomes effective in April 2022. (Tr. 762:17-763:4; ECF 116, 34)  Bokesch used a 1.99 percent discount rate for determining present value for this component of damages. (Tr. 763:20-764:1)  Once the mitigating factor of Joffrion's reduced retirement benefits that he will begin receiving upon his separation is accounted for, Bokesch determined the future value of Joffrion's lost NCANG retirement pay to be $370,627, and the present value to be $226,515. (Tr. 763:20-764:8; ECF 116, EX. 34)  When adjusted for tax effect, the number becomes $190,273. (Tr. 771:9-18; ECF 116, EX. 34)  The Court concludes $190,273 is the proper measure of damages for Joffrion's lost NCANG retirement pay.

### 3.  Loss of Household/Personal Services

31.     Joffrion seeks damages for lost household services in the amount of $221,961 based on his limitations around the house, both inside and outside, following the accident. (Tr. 419:4-9, 388:1-15)  Both Joffrion and Misty described how he was no longer able to mow grass, trim hedges, and perform other work around the yard, as well as perform maintenance on family vehicles. (Tr. 386:18-387:23, 387:3-23)  Joffrion's ability to help out with activities inside the house, such as vacuuming and doing laundry, was also significantly reduced. (Tr. 387:24-388:15)  Yount calculated the value of these damages for Joffrion to be $221,961, which consisted of a pre-trial loss of $44,904, and a future loss of $177,057; Bokesch testified he accepted the calculations from

Yount for this element of Joffrion's damages. (EX: 44; ECF 116, EX. 34; Tr. 768:19-769:4)
Accordingly, the Court awards Joffrion $221,961 for lost household services.

### 4. Pain and Suffering

32.     "An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury itself." *Boan*, 541 S.E.2d at 244.  "Pain and suffering have no market price" and "are not capable of being exactly and accurately determined." *Edwards v. Lawton*, 136 S.E.2d 708, 710 (S.C. 1964).  "There is no fixed rule or standard whereby damages for them can be measured . . . ," and the amount of damages awarded for pain and suffering is left to the sound discretion of the Court. *Id.*

33.     Based on the evidence presented, Joffrion has endured pain and suffering since the day of the accident.  By all accounts, the collision was severe and violent, and the photographic evidence confirms this statement.   Joffrion was ejected from his motorcycle, traumatically injuring his genitals in the process, and his body was airborne for a period of time before landing on the roadway. (Tr. 307:17-308:5)  Burgess described the collision as an "explosion." (Burgess Depo. 20:18-21:6)  While Joffrion's pain improved and resolved in some parts of his body in the months following the accident, it increased in others, especially in his abdomen, and his groin area in particular. (Tr. 372:23-373:12)  Beyond the testimony offered by Joffrion himself, his wife Misty and Burgess each described how pain has affected and limited Joffrion since the accident around the house and in his daily life. (Tr. 644:21-645:18, 646:15-647:5, 647:6-18; Burgess Depo. 54:12-55:15, 58:1-15)   Emanuel and Gosciniak described how pain impacted Joffrion in his DoD technician job and NCANG duties. (Emanuel Depo. 38:10-21, 33:4-24; Gosciniak Depo. 25:4-19, 26:6-12, 45:11-19, 55:20-56:10)  The testimony and other evidence clearly demonstrates Joffrion still continues to experience pain, that it is chronic, and he will likely continue to experience it in

the future in certain parts of his body, especially his core area. (Tr. 546:17-547:18; EX. 6: Duke Health – Novick – 00281, 00279-00280)  Based on this evidence, the Court awards Joffrion $2,000,000 for past and future pain and suffering.

### 5.  Loss of Enjoyment of Life and Permanent Impairment

34.    Loss of enjoyment of life "is a compensable element, separate and apart from pain and suffering, of a damages award."  *Boan*, 541 S.E.2d at 244.   These damages are meant to "compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents, recreational interests, hobbies, or avocations."  *Id*. (footnote omitted).  Similar to pain and suffering, there is no exact measure for loss of enjoyment of life.  *Schumacher v. Cooper*, 850 F. Supp. 438, 453 (D.S.C. 1994).

35.    The record is replete with examples of activities Joffrion, who is only 44-years-old, has had to alter or give up because of the motorcycle accident.  He is no longer able to engage in many activities he engaged in and enjoyed prior to the accident, such as riding his motorcycle, both with friends and his wife, working out and staying fit, and working in the yard and on the family vehicles. (Tr. 414:17-415:5, 385:22-386:17, 386:18-387:23, Burgess Depo. 54:12-55:15, 58:1-15)  He will soon lose his military career and his job. (EX. 45)  Even going to the bathroom is uncomfortable for him on a daily basis. (Tr. 416:3-13)  Joffrion and his wife both described in detail how the intimacy in their marriage has been adversely affected by the accident as well as how Joffrion's role as a father to Royce has been impacted by his injuries. (Tr. 388:16-389:10, 658:3-659:13, 660:25-661:14, 661:4-7)  Based on this evidence, the Court awards Joffrion $2,000,000 for past and future loss of enjoyment of life.

### 6. Mental Anguish

36.     "Separate damages are given for mental anguish where the evidence shows, for example, that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence." *Boan*, 541 S.E.2d at 244.

37.     The record is also replete with examples of the mental anguish Joffrion has experienced since the motorcycle accident. The collision, as described previously, was severe and traumatic. Tragically, it took the life of his friend, Jackson. (Tr. 308:25-309:11, 315:20-316:15)  As for Joffrion, beyond his physical injuries, he has experienced nightmares and flashbacks of the accident, and has suffered from PTSD. (Tr. 623:15-625:24; Frink Depo. 34:4-17)  Misty testified Joffrion became irritable and extremely short-tempered following the crash, especially around their son. (Tr. 650:5-22)  She also described how her husband became more reserved and no longer wanted to be around other people. (Tr. 650:5-22)  Burgess testified Joffrion was no longer the same person and became bitter and depressed. (Burgess Depo. 54:12-55:15, 58:1-15)  Emanuel described how Joffrion became a loner at work and was short-tempered and less patient with his co-workers. (Emanuel Depo. 34:22-35:12, 35:13-25, 37:17-38:3)  Gosciniak also explained how Joffrion became increasingly irritable and angry at work, and he testified that depression set in with Joffrion following the crash. (Gosciniak Depo. 18:8-11, 19:9-11, 19:20-24, 21:3-22:15, 28:19-29:18, 60:10-61:10)  Dr. Raley explained how Joffrion experienced anxiety, particularly when driving or riding in a vehicle, excessive and inappropriate guilt, due not only to survivor's guilt but also the effect the crash was having on his family dynamic, impaired sleep, largely due to flashbacks and nightmares about the crash, muscle tension due to anxiety and stress, and sexual difficulties due to his physical injuries. (Tr. 623:15-625:24)  Based on this evidence, the Court awards $2,000,000 for Joffrion's past and future mental anguish.

### 7.  Disfigurement

38.      Joffrion is entitled to a reasonable sum to compensate for his disfigurement.  *Schumacher*, 850 F. Supp. at 453.  Joffrion has scarring on his lower abdomen and  as a result of surgeries with Dr. Novick in October and December 2019.  (EX. 2: Joffrion Scars 00001-00005)  Based on the evidence presented, the Court awards Joffrion $10,000 for disfigurement.

## III.      CONCLUSION

Based on the foregoing, the Court FINDS AND CONCLUDES that the government is liable to Joffrion in the total amount of $7,496,435.58.  This total is comprised of $251,665.58 for past medical expenses, $3,983 for mileage incurred for medical visits, $166,411 for future medical expenses, $22,862 for lost pre-trial DoD technician wages, $816,703 for lost future DoD technician wages, $29,167 for lost 401(k) employer match contributions, LESS $324,438 for disability payments due to his separation from the NCANG, $107,848 for lost future NCANG wages, $190,273 for lost NCANG retirement pay, $221,961 for lost household services, $2,000,000 for pain and suffering, $2,000,000 for loss of enjoyment of life and permanent impairment, $2,000,000 for mental anguish, and $10,000 for disfigurement.

**IT IS SO ORDERED.**

Signed this 17th day of March 2022, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE